# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SID MURDESHWAR, Individually and on Behalf of All Others Similarly Situated, | ) Case No.: 1:11-civ-20549-UU<br>)<br>) <u>CLASS ACTION</u><br>) |
| Plaintiff, | ) |
| v. | ) **AMENDED COMPLAINT FOR**<br>) **VIOLATIONS OF THE FEDERAL**<br>) **SECURITIES LAWS** |
| SEARCHMEDIA HOLDINGS LIMITED, f/k/a IDEATION ACQUISITION CORP., SEARCHMEDIA INTERNATIONAL LIMITED, ROBERT N. FRIED, PHILLIP FROST, RAO UPPALURI, STEVEN D. RUBIN, GLENN HALPRYN, THOMAS E. BEIER, DAVID H. MOSKOWITZ, SHAWN GOLD, GARBO LEE, PAUL CONWAY, QINYING LIU, EARL YEN, and JENNIFER HUANG, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) <u>DEMAND FOR JURY TRIAL</u><br>) |
| Defendants. | )<br>) |

Lead Plaintiff Cattolica Partecipazioni S.p.A., along with additional Plaintiffs Noel Upfall, Sid Murdeshwar, Wallace Sapp, Joel Johanneson, Hymie Akst, and Mehmet Canga (collectively, "Plaintiffs") allege the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by SearchMedia Holdings Limited, formerly Ideation Acquisition Corp. ("SearchMedia" or "Ideation" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by SearchMedia; and (c) review of other publicly available information concerning SearchMedia.

## I.   NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of: (i) all persons or entities who purchased or otherwise acquired SearchMedia (formerly Ideation) securities between April 1, 2009 and August 20, 2010, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and (ii) all persons or entities who held common stock of Ideation on October 2, 2009, and were eligible at the Company's October 27, 2009, special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act.

2.      Ideation was a "blank check"[1] company organized under the laws of Delaware on June 1, 2007, and formed for the purpose of acquiring, through a merger, capital stock exchange, asset acquisition or other similar business combination, one or more businesses.   On November

---

[1]"Blank check" is a term that is commonly used to refer to a special purpose acquisition company ("SPAC").

1

26, 2007, Ideation completed its IPO and raised approximately $80 million by selling 10,000,000 units at $8.00 per unit (with each unit consisting of one share of common stock and one warrant exercisable for an additional share of common stock).

3.      While Ideation possessed considerable discretion in identifying and consummating a business combination, there were three general limitations imposed by its Amended and Restated Certificate of Incorporation.

a.      *First*, the target business that Ideation acquired or merged with had to have a fair market value equal to at least 80% of Ideation's net assets (excluding deferred underwriting discounts and commissions of $2.73 million) at the time of such acquisition/merger, determined by the Ideation Board based on standards generally accepted by the financial community, such as actual and potential sales, earnings, cash flow and book value.

b.      *Second*, Ideation only had twenty-four months to consummate a transaction.  Ideation would continue in existence only until November 19, 2009, at which date, if Ideation had not completed a business combination, its corporate existence would cease except for purposes of winding up its affairs and liquidating. As such, Ideation was required to hold the approximately $78.8 million of proceeds from its IPO in a trust account, which were to be released only upon the consummation of a business combination or liquidation.

c.      *Third*, the business combination could only occur if: (i) approved by a majority of Ideation's stockholders; and (ii) stockholders owning less than 30% of the shares sold in Ideation's IPO, (a) voted against the transaction, and (b)

2

exercised their conversion rights (*i.e.*, the option at the time of the stockholder vote to convert shares into cash, essentially entitling the stockholder to receive their pro rata distribution of the approximately $78.8 million in the trust account).

4.      Ideation was formed by a team of sophisticated and experienced business executives that consisted of Defendants Phillip Frost ("Frost"), Rao Uppaluri ("Uppaluri"), Steven D. Rubin ("Rubin"), Glenn Halpryn ("Halpryn"), Thomas E. Beier ("Beier"), David H. Moskowitz ("Moskowitz"), and Shawn Gold ("Gold").   On June 12, 2007, in connection with the formation of Ideation, the initial stockholders issued themselves 2,500,000 shares of common stock for $0.01 per share or a total of $25,000.   Additionally, they purchased warrants exercisable for 2,400,000 shares of Ideation common stock, for $1.00 per warrant or a total of $2,400,000, in a private placement transaction that occurred simultaneously with the consummation of the IPO. The initial stockholders, however, agreed to waive their respective rights to participate in any liquidation distribution with respect to their initial shares.   Hence, these shares and warrants would be worth tens of millions of dollars if Ideation consummated a transaction but would become worthless if Ideation failed to consummate a stockholder-approved transaction by November 19, 2009.

5.      Sixteen months after its IPO, on April 1, 2009, Ideation announced that it had signed a definitive agreement to acquire SearchMedia International Limited ("SMIL"), a multi-platform media company in China and integrated operator of outdoor billboard and in-elevator advertising networks.   Pursuant to an agreement and plan of merger, conversion and share exchange ("Share Exchange Agreement"), following receipt of stockholder approval by Ideation, Ideation would complete a corporate reorganization (whereby Ideation would merge with

3

and into ID Arizona Corp. ("ID Arizona"), with ID Arizona surviving the merger and ID Arizona becoming a Cayman Islands exempted corporation) that would result in a re-domestication of Ideation into a Cayman Islands exempted company ("Ideation Cayman"), after which the holders of SMIL's shares, warrants, options and restricted shares would exchange the outstanding securities of SMIL held by them for ordinary shares, warrants, options and restricted shares, respectively, of Ideation Cayman.   Under the terms of the Share Exchange Agreement, Ideation announced that it would issue to SMIL shareholders 8,578,215 million ordinary Ideation Cayman shares, representing approximately 41% of the ordinary shares of the combined company, in exchange for all outstanding SMIL common shares.   On a fully diluted basis, SMIL would own 44% of the combined company. Additionally, SMIL warrants, options and restricted shares would be exchanged for new Ideation Cayman warrants, options and restricted shares.   Based on Ideation common shares, warrants and options on a treasury method basis, and a conversion value of $7.8815 per share, the equity value of the proposed transaction at closing was approximately $176.7 million.

6.     In soliciting the requisite shareholder approval for the proposed transaction, Ideation and its Board of Directors aggressively touted SMIL's profitable and scalable revenue model.   Despite a relatively short operating history, investors were told that SMIL's revenues had shown meteoric growth, as revenues increased from $7.8 million for the 2007 fiscal year ("FY 2007") to $88 million for the 2008 fiscal year ("FY 2008").   SMIL was supposedly "well positioned to continue its impressive growth trend."   Equally impressive, SMIL was presented as a highly profitable company generating positive net income.   Investors were told that SMIL's impressive financial growth was going to continue and provided with "guidance for 2009 [of]

approximately $123 million in sales, $50 million of EBIT, and $30 million of net income."

7.      As described herein, certain defendants solicited votes from stockholders necessary to complete the transaction by means of a proxy/prospectus dated October 5, 2009 ("Proxy/Prospectus"), and other public statements that touted SMIL's financial performance and operations, as well as the "extensive" due diligence Ideation purportedly conducted of SMIL. While the Proxy/Prospectus acknowledged some internal control deficiencies that had been previously identified by SMIL's auditor, Ideation allayed concerns by indicating that SMIL was undertaking remedial steps to address deficiencies, setting up an internal audit team, hiring additional legal and compliance staff, and planning to implement additional steps to address the identified deficiencies and improve its internal control over financial reporting.  Furthermore, while the Proxy/Prospectus recited potential risks that could arise in connection with the merger with SMIL, it provided no reasons to suspect that Ideation had failed to reasonably investigate such risks.  In short, Ideation's shareholders had no reason to doubt the Proxy/Prospectus's characterization of SMIL as a profitable, rapidly growing, and valuable business with strong future potential.

8.      Defendants were desperate to obtain shareholder approval and consummate the transaction.  Ideation was closing in on the November 19, 2009 deadline, and it became clear that if the transaction with SMIL was not approved and/or the transaction fell apart for any reason, there was no longer sufficient time to consummate an alternative transaction.

9.      In reliance on the information contained in the Company's Proxy/Prospectus, the transaction was overwhelmingly approved at a special meeting of stockholders on October 27, 2009, and consummated on October 30, 2009 (the "Merger").  Thereafter, Ideation changed its

name to SearchMedia Holdings Limited ("SearchMedia").

10.     This action arises from material misstatements and/or omissions in the Proxy/Prospectus, as well as other public statements issued during the Class Period related to the Merger and SMIL.   Unfortunately, Ideation stockholders voted to approve the Merger instead of opting to receive $7.8815 in cash per share of Ideation common stock.  It turned out that the Chinese company that Ideation merged with was not nearly the financial success portrayed in the Proxy/Prospectus.   Not long after the Merger and after several announcements that it would be unable to timely file any financial statements with the SEC, on August 20, 2010, SearchMedia announced that SMIL's historical financial statements for FY 2007 and FY 2008 would have to be restated and that the financial statements from these periods could no longer be relied upon.

11.     On this news, SearchMedia's common stock fell $0.78 per share, or nearly 23%, to close on August 20, 2010, at $2.62 per share, on unusually heavy trading volume, and further declined an additional $0.92 per share, more than 35%, to close on August 23, 2010, at $1.70 per share, again on unusually heavy trading volume.   Over the course of these two days of trading, SearchMedia's common stock declined a combined $1.70 per share, or 50%, from the closing price of $3.40 per share on August 19, 2010.   Similarly, SearchMedia's warrants fell $0.22 per warrant, or nearly 41%, to close on August 20, 2010, at $0.32 per warrant.

12.     A full year after the Merger, SearchMedia filed its Annual Report on Form 10-K with the SEC for FY 2009 that contained its restated financial results for FY 2008 (the "Restatement").   Despite Ideation's purported "extensive" due diligence, the Restatement revealed that SMIL's revenues had been massively overstated due to flagrant accounting irregularities.   SMIL's originally reported revenue of $7.8 million for FY 2007 had been

6

overstated by approximately $6 million and SMIL's originally reported FY 2008 revenue of approximately $88 million had been overstated by more than $46 million.   The improper revenue recognition involved was intentional.   According to SearchMedia, among others, the "[a]pparent fictitious business transactions, forged contracts and monitoring reports resulted were identified in overstated revenue" *of more than $23.6 million for FY 2008*, and another *$14.4 million* of improperly recognized revenue in FY 2008 resulted from the "[f]ailure to properly disclose, approve and document transactions among related entities, which resulted in the overstatement of sales and costs of these companies in the operating results of [SMIL's] subsidiaries."   In essence, the profitable company touted to Ideation investors was an illusion: the Restatement revealed a FY 2008 net loss in excess of $35 million.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.   JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), as well as Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this District pursuant to § 28 U.S.C. § 1391(b), § 27 of the Exchange Act (15 U.S.C. § 78aa(c)).   Many of the acts charged herein, including the preparation

and dissemination of materially false and/or misleading information, occurred in substantial part in this District.

17.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.   PARTIES

**A.    Plaintiffs**

18.    Lead Plaintiff Cattolica Partecipazioni S.p.A., as set forth in its previously filed certification, which is incorporated herein by reference, purchased SearchMedia securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19.    Plaintiff Noel Upfall, as set forth in his previously filed certification, which is incorporated herein by reference, purchased SearchMedia securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20.    Plaintiff Sid Murdeshwar, as set forth in his previously filed certification, which is incorporated herein by reference, purchased SearchMedia securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

21.    Plaintiff Joel Johanneson, as set forth in the accompanying certification, incorporated herein by reference, purchased SearchMedia securities during the Class Period and

suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22.     Plaintiff Wallace Sapp, as set forth in the accompanying certification, incorporated herein by reference, purchased SearchMedia securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23.     Plaintiff Hymie Akst, as set forth in his previously filed certification, which is incorporated herein by reference, purchased SearchMedia securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

24.     Plaintiff Mehmet Canga, as set forth in his previously filed certification, which is incorporated herein by reference, purchased SearchMedia securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B.**     **Defendants**

25.     Defendant SearchMedia, formerly Ideation, is a Cayman Islands corporation with its principle executive offices located at 15A Zhao Feng Universe Building, 1800 Shong Shan Xi Road, Shanghai, China 200235.

26.     Defendant SMIL was an exempted holding company formed with limited liability under the laws of the Cayman Islands in February 2007.  Defendant SMIL became a wholly owned subsidiary of SearchMedia as result of the Merger.  As used herein, the term "SMIL" refers to the standalone pre-merger entity that is now a wholly owned subsidiary of SearchMedia.

27.     Defendant Robert N. Fried ("Fried") was, at all relevant times, President, Chief Executive Officer ("CEO"), and Director of Ideation up until the Merger, and was, at all relevant times, Co-Chairman of SearchMedia after the Merger.   Defendant Fried signed or authorized the signing of the Proxy/Prospectus.   Defendant Fried signed a letter attached to the Proxy/Prospectus urging Ideation shareholders to approve the merger with SMIL.   Moreover, Defendant Fried was actively involved in the requisite negotiations and due diligence of SMIL.   Prior to the Merger, Defendant Fried personally traveled to SMIL's headquarters in Shanghai, China to meet with management and "review diligence items and tour the facilities."   Defendant Fried also presented at multiple investor conferences prior to the Ideation shareholder vote on the Merger during which he touted the proposed transaction.

28.     Defendant Frost was, at all relevant times, Chairman of the Board of Ideation up until the Merger.   Defendant Frost, through himself and his affiliates, held a significant interest in Ideation.

29.     Defendant Uppaluri was, at all relevant times, Treasurer, Director, and the principal financial and accounting officer of Ideation up until the Merger.   Defendant Uppaluri signed or authorized the signing of the Proxy/Prospectus.   Defendant Uppaluri has years of professional experience in finance related positions.   Additionally, Defendant Uppaluri is a Chartered Financial Analyst (CFA) and holds a Ph.D. in finance from Indiana University.   According to the Proxy/Prospectus, Defendant Uppaluri personally traveled to SMIL's headquarters in Shanghai, China to meet with management and "review diligence items and tour the facilities."   Defendant Uppaluri was actively involved in the requisite negotiations and due diligence with SMIL.

30.     Defendant Rubin was, at all relevant times, Secretary of Ideation and a Director of

SearchMedia thereafter. Defendant Rubin signed or authorized the signing of the Proxy/Prospectus. Defendant Rubin was slated to serve as an Executive Director after the consummation of the Merger. Prior to the Merger, Defendant Rubin personally traveled to SearchMedia's headquarters in Shanghai, China to meet with the SMIL management team and "review diligence items and tour the facilities." Defendant Rubin was actively involved with the negotiations and due diligence between Ideation and SMIL prior to the Merger.

31.     Defendant Halpryn was, at all relevant times, a Director of Ideation up until the Merger and signed or authorized the signing of the Proxy/Prospectus. Defendant Halpryn was slated in the Proxy/Prospectus to serve as a Director of SearchMedia following the consummation of the Merger between Ideation and SMIL. Defendant Halpryn was a member of the Company's audit committee and has previously been involved in other "blank check" companies.

32.     Defendant Beier was, at all relevant times, a Director of Ideation up until the Merger and signed or authorized the signing of the Proxy/Prospectus. Defendant Beier was a member of Ideation's audit committee. The Proxy/Prospectus described Beier as "qualif[ying] as an 'audit committee financial expert' under SEC guidelines."

33.     Defendant Moskowitz was, at all relevant times, a Director of Ideation up until the Merger and signed or authorized the signing of the Proxy/Prospectus. Defendant Moskowitz was a member of Ideation's audit committee and holds a B.S. in accounting from Pennsylvania State University.

34.     Defendant Gold was, at all relevant times, a Director of Ideation up until the Merger and signed or authorized the signing of the Proxy/Prospectus. Defendant Gold was a member of Ideation's audit committee.

35.     Defendants Fried, Frost, Uppaluri, Rubin, Halpryn, Beier, Gold, and Moskowitz (collectively, the "Ideation Defendants" or the "Ideation Board"), participated in Ideation Board meetings and conference calls, voted to approve the merger, signed and/or authorized the signing of the Proxy/Prospectus, approved the Proxy/Prospectus, solicited approval of the Merger through the Ideation Board's unanimous recommendation that Ideation shareholders vote in favor the merger with SMIL, which appeared in the Proxy/Prospectus, and permitted the use of their names in connection with the solicitation of proxies from Ideation shareholders.   In their capacities as signatories of documents set forth below, as well as by virtue of their authority to approve the Merger, the Ideation Board possessed the power and authority to control the contents of the Proxy/Prospectus, as well as Ideation's press releases, investor and media presentations, and other SEC filings.

36.     Defendant Garbo Lee ("Lee") was, at all relevant times, President of SMIL prior to the Merger, and was, at all relevant times, President of SearchMedia after the Merger. The Proxy/Prospectus slated Defendant Lee to serve as a Director following the consummation of the Merger between Ideation and SMIL.   Defendant Lee presented at several investor conferences to promote SMIL's proposed transaction with Ideation.

37.     Defendant Qinying Liu ("Liu") was, at all relevant times, Chairman of SMIL prior to the Merger, and was, at all relevant times, Co-Chairman of the Board of SearchMedia after the Merger.   Defendant Liu was slated in the Proxy/Prospectus to become a Director after the consummation of the Merger between SMIL and Ideation.   Further, the Proxy/Prospectus designated Defendant Liu as the "Management Shareholder Representative."   The Proxy/Prospectus also identified Defendant Liu as the majority equity shareholder (60%) in

numerous SMIL subsidiaries.

38.     Defendant Earl Yen ("Yen") was, at all relevant times, Vice Chairman of SMIL prior to the Merger, and was, at all relevant times, a Director of SearchMedia after the Merger. Defendant Yen was slated in the Proxy/Prospectus to serve as a Director following the consummation of the Merger between Ideation and SMIL. The Proxy/Prospectus identifies Defendant Yen as having investment banking experience, and as the founder and managing director of the China-focused private equity firm CSV Capital Partners.

39.     Defendant Jennifer Huang ("Huang") was, at all relevant times, Chief Financial Officer ("CFO") of SMIL between April 2008 and July 2009, and was, at all relevant times, Acting CFO after the Merger until on or around January 4, 2010.   Additionally, Defendant Huang was, at all relevant times, Chief Operating Officer ("COO") of SMIL prior to the Merger, and was, at all relevant times, COO of SearchMedia after the Merger.   Defendant Huang is a member of the Chinese Institute of Certified Public Accountants, and has several years of experience at PricewaterhouseCoopers' Shanghai office where she was promoted to audit manager. She also holds an MBA from Harvard Business School. According to the Proxy/Prospectus, Huang was slated to serve as COO after upon the consummation of the Merger between Ideation and SMIL

40.     Defendants Lee, Liu, Yen, and Huang (collectively, the "SMIL Defendants"), as officers, directors, and/or shareholders of SMIL, among others, participated in arranging and negotiating the Merger, provided information about SMIL's business, financial results, and financial projections to Ideation in connection with the Merger, permitted the use of their names in connection with the solicitation of proxies from Ideation shareholders, and appeared at analyst conferences to discuss the Merger and to solicit approval for the Merger from Ideation

13

shareholders.  By virtue of their authority and furnishing of information to Ideation, the SMIL Defendants possessed the power to control the contents of the Proxy/Prospectus, as well as Ideation's press releases, investor and media presentations, and other SEC filings.

41.     Defendant Paul Conway ("Conway") was, at all relevant times since February 2010, the CEO of SearchMedia.   Formerly, Defendant Conway was Managing Director of Media Investment Banking for Oppenheimer & Co.   According to Defendant Fried, Defendant Conway "spearheaded the [M]erger with SMIL on behalf of Ideation" and in doing so, "during an 18-month period, [Defendant Conway] worked tirelessly and closely with [Ideation].

42.     Defendants Fried, Frost, Uppaluri, Rubin, Halpryn, Beier, Gold, Moskowitz, Lee, Conway, Liu, Yen, and Huang, are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of SearchMedia's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each group-published information, the result of the collective actions of the Individual Defendants.

## IV.   CLASS ACTION ALLEGATIONS

43.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of: (i) all persons or entities who purchased or otherwise acquired SearchMedia, f/k/a/ Ideation, securities between April 1, 2009 and August 20, 2010, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act; and (ii) all persons or entities who held common stock of Ideation on October 2, 2009, and were eligible to vote at the Company's October 27, 2009, special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act.   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, SearchMedia (f/k/a Ideation), securities were actively traded on the NYSE Amex ("AMEX").   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of SearchMedia shares and warrants were traded publicly during the Class Period on the AMEX.   Record owners and other members of the Class may be identified from records maintained by SearchMedia or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

46.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

     a.     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

     b.     Whether the Proxy/Prospectus and other public statements disseminated to Ideation shareholders and investors during the Class Period contained material misstatements and/or omitted to state material information;

     c.     Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the operations, financial performance and prospects of Ideation, SMIL, or SearchMedia;

     d.     Whether, solely with respect to the claims under section 10(b) of the Exchange Act, Defendants acted with scienter;

     e.     Whether, solely with respect to the claims under section 10(b) of the Exchange Act, reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

     f.     To what extent the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## V.   SUBSTANTIVE ALLEGATIONS

49.     This is regrettably the latest catastrophe in a growing series of disastrous corporate transactions involving Chinese-headquartered companies and U.S.-based subsidiaries. According to a December 21, 2010 article published by *TheStreet.com*, entitled "SEC Probes China Stock Fraud Network," the SEC has received multiple calls for the investigation of fraud among China-based stocks.   Based on due diligence and research in other previous mergers and acquisitions, Peter Humphrey, a corporate investigator and due diligence expert based in Beijing, estimates that as many as one-third of Chinese companies listed on the NYSE, Amex and NASDAQ are likely reporting fictional profits.

50.     James Chanos, a hedge fund manager who uncovered the Enron accounting fraud in the early 2000s, has stated that accounting irregularities at Chinese companies are the norm, not the exception.   At the October 2010 Grant's Fall Investment Conference in New York, Chanos punned on U.S. accounting principles (known as GAAP) to describe Chinese accounting tactics as CRAAP—Chinese Regularly Accepted Accounting Policies.   He has also described Chinese stocks as "a short seller's dream."

51.     The concern over the shady dealings of these Chinese companies has grown so large that even Congress has taken note.   On September 9, 2010, the House Financial Services

Committee sent a letter to the SEC and the Public Company Accounting Oversight Board questioning the accuracy of the audits performed for Chinese companies and urging the agencies to address the issue.  The letter, signed by Reps. Spencer Bachus and Chris Lee, went on to express a broad concern about fraud among Chinese-based companies, stating that "American investors deserve high-quality and independent financial reporting so that all market participants can trust the accuracy of the audit work for U.S. publicly-traded companies."

52.     The SEC has taken heed, and as of December 2010, has launched investigations of China Sky One Medical, China Energy Savings Technology, Fuqi International, and Rino International.  According to *TheStreet.com*, SEC officials view these issues not as isolated, stand-alone incidents, but rather as manifestations of systemic problems.   As detailed below, the SEC has also launched an investigation into SearchMedia's restated financial results.

**A.**     **Materially False and Misleading Statements Issued During the Class Period**

**1.**     **Defendants' Statements Prior to the Merger**

53.     The Class Period begins on April 1, 2009.  On this day, Ideation issued a press release titled, "Ideation Acquisition Corp. Signs Definitive Agreement to Acquire SearchMedia International Limited."   Ideation's press release stated, in relevant part:

o   National Coverage of 59 Cities and Leading Market Share in Chinese Advertising Industry
o   Extensive Advertising Network Across Multiple Media Platforms
o   Highly Diversified Advertising Base with Local, National and International Clients
o   Profitable and Scalable Revenue Model with Low Capex Requirements
o   Proven History of Organic and Acquisitive Growth
o   Strong Management Team

Los Angeles, CA, April 1, 2009, Ideation Acquisition Corp. ("Ideation" or the "Company") (NYSE AMEX: IDI) and SearchMedia International Limited ("SearchMedia") announced today that they have entered into an agreement and

18

plan of merger, conversion and share exchange ("Share Exchange Agreement"). Pursuant to the Share Exchange Agreement, following receipt of stockholder approval by Ideation, Ideation will complete a corporate reorganization that will result in a redomestication of Ideation into a Cayman Islands exempted company ("Ideation Cayman"), after which the holders of SearchMedia's shares, warrants, options and restricted shares will exchange the outstanding securities of SearchMedia held by them for ordinary shares, warrants, options and restricted shares, respectively, of Ideation Cayman.

Following the completion of the merger, SearchMedia's current management team will remain in place with Crystal Liu, Garbo Lee and Jennifer Huang, the current Chairman, President and CFO of SearchMedia, respectively, slated to become the Chairman, President and CFO of the combined company.

"SearchMedia has built a strong market position in China's fast-growing outdoor advertising market and is well positioned to continue its impressive growth trend," stated Dr. Phillip Frost, Chairman of Ideation Acquisition Corp.

"Under the leadership of SearchMedia's seasoned management team, we are confident of continued expansion of their well established position in the marketplace," said Robert Fried, President and CEO of Ideation. "This is a very impressive company operating in a time-tested, proven space."

About SearchMedia

SearchMedia is a leading nationwide multi-platform media company in China. It is one of the largest integrated operators of outdoor billboard and in-elevator advertising networks in China. SearchMedia ranked first in market share of in-elevator advertising displays in 13 out of the 26 most affluent cities in China and ranked second in an additional nine of these cities, according to a leading international research company in China. SearchMedia's core outdoor billboard and in-elevator portfolios are complemented by its subway advertising platform, which together, create an attractive multi-platform "one-stop shop" service for its local, national and international advertising clients that numbered more than 700 cumulatively since its inception.

SearchMedia currently owns and operates a network of over 1,500 high-impact billboards with over 500,000 square feet of surface area and one of China's largest networks of in-elevator advertisement panels consisting of over 180,000 frames in 59 cities around China. Additionally, SearchMedia operates a network of over 1,200 large-format light boxes in concourses of eight major subway lines in Shanghai. According to the Metro Authority of Shanghai, in 2008, these subway lines carried an aggregate average daily traffic of approximately three million commuters.

"We are very excited about the combination of SearchMedia with Ideation," said Crystal Liu, Chairman of SearchMedia. "We believe Ideation is an ideal partner for us because of Ideation's strong capital markets experience, media industry focus, and its management team's successful track record in executing M&A consolidation strategies."

SearchMedia Historical and Projected Financials

| ($ in US millions) | 2007 | 1H08 | 2008E | 2009E |
|---|---|---|---|---|
| Revenue | $ 7.8 | $ 31.3 | $ 88.2 | $ 127.8 |
| EBITDA | $ 2.9 | $ 9.5 | $ 30.2 | $ 49.0 |
| GAAP Net Income (1) | $ 1.6 | $ 4.3 | $ 15.3 | $ 29.7 |

(1) GAAP Net Income adjusted for one time charges. 2H08 Expected Annualized Net Income of $21.9 million.

Summary of the Transaction

Under the terms of the Share Exchange Agreement, Ideation will issue to SearchMedia shareholders 8,578,215 million ordinary Ideation Cayman shares, representing approximately 41% of the ordinary shares of the combined company, in exchange for all outstanding SearchMedia common shares. On a fully diluted basis, SearchMedia will own 44% of the combined company. Additionally, SearchMedia warrants, options and restricted shares will be exchanged for new Ideation Cayman warrants, options and restricted shares.

Based on Ideation common shares, warrants and options on a treasury method basis, and a conversion value of $7.8815 per share, the equity value of the transaction at closing is approximately $176.7 million.

In addition, SearchMedia shareholders and restricted holders will be entitled to receive a potential earnout payment of up to 10,150,352 additional shares of common stock of Ideation Cayman as follows:

| Achieved 2009 US GAAP Net Income[1] | Total Additional Ordinary Shares |
|---|---|
| Less than $25.7 million | None |
| Between $25.7 million ⊂ $38.4 million | Between 0 and 10.2 million |
| Greater than $38.4 million | 10.2 million |

(1) Adjusted for extraordinary items and other expense.

Additionally, to the extent SearchMedia fails to earn the maximum number of potential earn-out shares based on achieved 2009 GAAP Net Income, SearchMedia can earn the remainder of the earn-out shares, up to a total of 10,150,352 million, if SearchMedia's stock price closes above $11.82 for 30 consecutive trading days prior to April 15, 2010.

The implied transaction valuation (including the maximum potential earnout) yields an attractive 2009 P/E multiple of 6.7x on a fully diluted basis. As of March 27, 2009, the projected 2009 P/E multiples for comparable companies were between 9.7x and 14.8x with a mean multiple of 12.9x.

The transaction is subject to customary closing conditions, completion of all necessary documentation and approval of the shareholders of Ideation Acquisition Corp.

Following the completion of the transaction, Ideation Cayman's board will consist of nine members, five designated by SearchMedia and four designated by certain shareholders of Ideation. At least three of the SearchMedia shareholder designees and two of the Ideation shareholder designees will be independent.

The Frost Group, LLC, an affiliate of Ideation, has committed up to $18.25 million to support the transaction through open market or privately negotiated purchases of publicly held Ideation common shares.

(Emphasis added).

54.    On May 20, 2009, Ideation and SMIL presented at the Eighth Annual JMP Securities Research Conference in San Francisco.  Defendants Fried, Lee, Lin, and Yen, were present.  During the conference, Defendants Fried and Yen, in relevant part, stated:

21

[*Defendant Fried*:] . . .   I'm going to briefly describe the transaction, and then I am going to hand the podium off to the executives from [SMIL] who have joined us. **The guidance for 2009 is approximately $123 million in sales, $50 million of EBIT, and $30 million of net income. On the basis of those numbers, the following transaction was agreed upon**. Ideation will issue 10 million shares to the existing stakeholders of [SMIL]. Those will be 10 million shares at the trust value. So, we are a SPAC, meaning all we are is a blank check company with cash. The value per share of the amount of cash in trust is $7.88. **So, we will issue 10 million shares at $7.88 as the initial consideration for the transaction.**

*       *       *

[*Defendant Yen*:] . . . **Also, we successfully integrated 12 acquisitions from late 2007 to mid-2008**. This was achieved through the efforts of our management team, which combines expertise in local operations, international media and advertising, as well as some U.S. public company experience. **Our financial position is strong.** After this transaction, we will have essentially no debt. **Our operations are highly profitable and generate healthy cash flows.**

**As you can see from this financial slide, we've experience exceptional growth over the past three years. In 2008, we generated over $80 million of revenues and over $30 million of EBITDA. The second half of last year is perhaps even more representative since we made several acquisitions during the first half of 2008. The last one was on July 1. So, if you look at our second half of 2008 annualized, we generated close to $110 million of revenues, and over $40 million of EBITDA on an annualized basis.**

**In spite of a weaker global economy, we are expecting an even stronger 2009. Our media concessioners are expanding.** Our rate cards increased at the beginning of this year, and we believe there is a good possibility of achieving higher media occupancy rates.

(Emphasis added).

55.     On July 16, 2009, the Company filed a Current Report with the SEC on Form 8-K which was signed by Defendant Fried.   The Company indicated in relevant part that Ideation and SMIL were going to meet with various investors beginning on July 16, 2009.   Attached as an exhibit to the Company's Form 8-K was an investor presentation that Ideation and SMIL intended to use in the meetings with investors.   The investor presentation listed SMIL's net revenue for

2007 and 2008 as $7.8 million and $88.6 million, respectively, and SMIL's net income for 2007 and 2008 as $1.6 million and $15.6 million, respectively.

56.   On October 13, 2009, Ideation and SMIL presented at the ROTH China Conference in Miami Beach, Florida.   Defendants Fried, Yen, and Lee, were present.   Defendants Fried and Yen, in relevant part, stated:

> [*Defendant Fried*:] . . . **SearchMedia is anticipating for 2009 a little over $25 million in net income on sales in excess of $100 million, EBITDA of $41 million.**
>
> \*       \*       \*
>
> [*Defendant Fried*:] When we first made this deal, SearchMedia was in a position where they had rolled up ten companies and owned some earn-out payments to those companies. **So, they were a company performing exceptionally well making great money, terrific cash flow, great revenue growth**, but they owed some cash. Also, the companies they acquired had an anticipation they would be publicly traded in the United States. So, last year when I got in touch with them, they were endeavoring to do an IPO with Deutsche Bank and Merrill Lynch. Because the markets were in the condition they were in they realized they could not do the IPO. We came in with our SPAC and our $20 million guarantee and the timing was excellent. So, they made the deal with us. They understood at the time that in order for a SPAC transaction to work it has to trade at a discount from the comps and it has to be an all stock transaction and certain other things had to be met. SearchMedia was smart enough to hit those beats. So, the transaction we reached was there for all parties. **We also had an audit completed by KPMG so these numbers are all U.S. GAAP KPMG audited numbers and we spent a full year now working with the company and doing diligence**. We finalized the transaction in March of this year. So, the effective date of the transaction is actually March 15.
>
> \*       \*       \*
>
> [Defendant Yen:] There are two ways to grow a business like ours, organically and through acquisition and we've done both. **During 2008, our original elevator portfolio increased by about three times in size and that was mostly through organic expansion. At the same time, we've also, during 2008, we successfully closed and integrated 12 acquisitions. Our operations are highly profitable and generate healthy cash flows. Through this transaction with Ideation, our balance sheet will be considerably strengthened.**
>
> **As you can see from the slide, we have experienced exceptional growth over the**

*past three years. In 2008, we generated over $80 million of revenues and around $30 million of EBITDA representing significant growth over 2007. The growth from '07 to '08 was about one-third organic and two-thirds via acquisition. We believe that our 2009 results demonstrate continued progress. In spite of the weakest market environment in recent memory, we are on course to achieve a modest increase in revenues. On paper we expect to achieve about 16% revenue growth this year.* However, this number might be slightly overstated because we were doing acquisitions throughout 2008. Under normalized basis, which means if you assume that we completed all the acquisitions, our 2008 acquisitions at the beginning of the year, we would be doing approximately 8% organic growth from '08 to '09.

(Emphasis added).

57.    These statements were materially false and/or misleading because, among other reasons:

a.    SearchMedia later admitted upon restating SMIL's historical financial results that: (i) SMIL's originally reported FY 2007 revenue of $7.8 million was overstated by approximately $6 million; (ii) SMIL's originally reported revenue for FY 2008 of $88 million was overstated by $46.9 million; and (iii) SMIL's gross profit, operating income, and net income originally reported for FY 2008 had been overstated as set forth in the below chart:

|  | Originally Reported | As Restated | Restatement Adjustment | Percent Overstated |
|---|---|---|---|---|
| *Gross Profit (Loss)* | $41,963,000 | $11,061,000 | ($30,902,000) | 279.4% |
| *Operating Income (Loss)* | $22,839,000 | ($8,237,000) | ($31,076,000) | 377.3% |
| *Net Income (Loss)* | $4,343,000 | ($35,080,000) | ($39,423,000) | 907.7% |

b.    SearchMedia later admitted that SMIL's FY 2009 financial projections for

24

that SMIL provided to Ideation (which Ideation repeated to investors) and SMIL provided to Ideation shareholders were materially false and misleading.   During a conference call on April 16, 2010, Defendant Conway specifically admitted that SearchMedia had contacted the sellers of [SMIL] to Ideation and notified them that the financial projections for 2009 provided to us and to other investors as late as October 2009, were wrong.

c.     As reflected by the Restatement, the apparent strength and growth of SMIL's total revenues and the revenues of its main segment, its in-elevator business, were largely the result of accounting irregularities and improper revenue recognition.

d.     The valuation of the proposed transaction (*i.e.*, the Merger) was incorrect as it was premised on SMIL's financial results and projections, which the Company now admits were incorrect at that time.   Moreover, as a result, Ideation shareholders would actually receive less than their fair share of the value of the assets and business of the combined entity upon completion of the Merger.

e.     The Proxy/Prospectus failed to disclose that, based on SMIL's actual financial results, the conversion value and/or cash liquidation value of $7.8815 per share of Ideation common stock was higher than the valuation of a share of post-Merger Ideation common stock if the Merger with SMIL occurred.   In its 2009 Form 10-K, the Company disclosed that the "fair value of equity per share after the merge date October 30, 2009 was US$3.987'" per share of SearchMedia.

## 2.     The Materially False and/or Misleading Proxy/Prospectus

58.     On July 15, 2009, September 10, 2009, September 23, 2009, and September 30, 2009, the Company filed revised versions of the Proxy/Prospectus for the Merger with the SEC, which were signed by Defendants Fried, Frost, Uppaluri, Rubin, Halpryn, Beier, Moskowitz, and

Gold, and which served as a proxy statement containing information for the special meeting of the Ideation stockholders relating to its proposed business combination with SMIL, and as a prospectus of ID Arizona with respect to securities to be issued to Ideation stockholders as part of that business combination.   Therein, the versions of the Proxy/Prospectus filed with the SEC on July 15, 2009, September 10, 2009, and September 23, 2009, and September 30, 2009, in relevant part, contained a discussion of SMIL's financial condition and results of operations, and also, in relevant part, each substantially repeated the following statements:

> Since SearchMedia entered the out-of-home advertising industry through its predecessors in 2005, it has achieved significant growth through acquisitions and organic expansion. From 2005 . . . SearchMedia expanded its network to over 175,000 poster frames and over 500,000 square feet of billboard space. ***SearchMedia's revenues, operating income and net income were $7.8 million, $2.2 million and $1.2 million, respectively, for the period from its inception on February 9, 2007 to December 31, 2007, or the 2007 period, and $88.6 million, $22.8 million and $4.3 million, respectively, for the year ended December 31, 2008.***

*       *       *

> **Revenues**
>
> SearchMedia derives its revenues from providing advertising services. ***During the period from the date of its inception on February 9, 2007 to December 31, 2007, or the 2007 period, and the year ended December 31, 2008, SearchMedia generated revenues of $7.8 million and $88.6 million, respectively.*** For the 2007 period, SearchMedia's revenues equal the revenues recognized from June 4, 2007, the date on which the financial statements of SearchMedia's variable interest entities were initially consolidated, to December 31, 2007.

*       *       *

> ***In-elevator platform.   SearchMedia typically signs advertising contracts with terms ranging from one to six months for in-elevator advertisements. Typically, SearchMedia negotiates for a contract price for covering a set of cities or districts within cities. SearchMedia may sometimes help certain clients design a detailed plan, based on the contract price and targeted demographics, with particular buildings where the advertisements will be displayed within the cities or districts specified under the contract. Progress payments are typically required at various stages of the contract performance.***

26

\*      \*      \*

SearchMedia recognizes advertising service revenues on a straight-line basis over the period in which the advertisement is required to be displayed, starting from the date SearchMedia first displays the advertisement. *SearchMedia only recognizes revenue if the collectibility of the service fee is probable.* The amount of advertising service revenues recognized is net of business taxes and surcharges ranging between 5% and 9%.

(Emphasis added).

59.     On October 5, 2009, the Company filed the final Proxy/Prospectus with the SEC.

The Proxy/Prospectus, in relevant part, substantially repeated the statements contained in the

earlier proxies/prospectuses. Additionally, the Proxy/Prospectus stated, in relevant part:

*SearchMedia's Financial Profile and Business Model*

Another factor important to the Ideation board of directors in identifying an acquisition target was that *SearchMedia has demonstrated an attractive financial profile. SearchMedia commenced business operations in Shanghai, China, in 2005 and has experienced significant growth through organic expansion and acquisitions.*

*SearchMedia's business model is highly scalable and can be characterized by a low cost structure and low level of capital expenditures required for expansion, which quickly generate attractive returns*. This will continue to allow SearchMedia to cost-efficiently expand and scale its operations in response to market conditions and new opportunities.

*In connection with its review of SearchMedia's historical financial statements and business model, the Ideation board of directors believes that SearchMedia's business will continue to demonstrate an attractive financial profile*.

\*      \*      \*

Although financial projections are inherently uncertain, *the Ideation board of directors believed, and continues to believe, the projections for SearchMedia's business are reliable, based on Ideation's extensive due diligence.*

60.     The Proxy/Prospectus contained a purported risk warning regarding prior material

weaknesses in SMIL's internal controls previously identified by SMIL's independent auditor.

27

Nevertheless, Ideation also highlighted that "following the identification of these internal control deficiencies," SMIL "undertook certain remedial steps to address certain deficiencies":

> In connection with the audit of SearchMedia's consolidated financial statements as of December 31, 2007 and December 31, 2008 and for the period from February 9 to December 31, 2007 and for the year ended December 31, 2008, SearchMedia's independent auditors identified a number of significant control deficiencies in its internal control procedures which, in the judgment of its independent auditors, adversely affect its ability to initiate, authorize, record, process and report financial data reliably in accordance with generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of its consolidated financial statements that is more than inconsequential will not be prevented or detected. Specifically, the significant control deficiencies identified by SearchMedia's independent auditors related to: (1) shortage of experienced accounting and finance personnel with adequate knowledge in US GAAP and SEC reporting requirements; (2) failure to properly identify and document all related party transactions; (3) insufficient implementation of acquisition-related due diligence procedures; (4) insufficient credit control procedures; and (5) ineffective board of directors oversight of financial reporting and internal control.
>
> ***Following the identification of these control deficiencies, SearchMedia undertook certain remedial steps to address certain deficiencies, including hiring additional accounting staff and training its new and existing accounting staff and conducting due diligence on companies with which it does business to identify related parties.*** SearchMedia is in the process of setting up an internal audit team to plan and implement Sarbanes-Oxley Act of 2002 related activities, and is hiring additional legal and compliance staff. SearchMedia plans to implement additional steps to address these identified control deficiencies and improve its internal control over financial reporting . . .

(Emphasis added).

61.     Further, the Proxy/Prospectus represented that SMIL satisfied the requirement that Ideation only acquire a business that had a fair market value of at least 80% of Ideation's net assets:

> ***Satisfaction of the 80% Test***
>
> The Ideation board of directors has determined that the fair market value of SearchMedia is at least 80% of Ideation's net assets. The Ideation board of directors derived a minimum equity valuation of $176.7 million for SearchMedia based upon a comparative price analysis of the price earnings ratio for companies similar to

SearchMedia and the anticipated price earnings ratio of SearchMedia. The board of directors came to the determination that, since the fair market value of SearchMedia is at least equal to 80% of Ideation's net assets before taking into account the earn-out payments, the earn-out thresholds, if achieved, would only represent an increase in the value of SearchMedia, which would therefore further exceed the 80% threshold.

*      *      *

### Satisfaction of the 80% Test

It is a requirement that any business acquired by Ideation have a fair market value equal to at least 80% of Ideation's net assets at the time of acquisition, which assets shall include the amount in the trust account. Ideation performed a thorough analysis of three companies within the outdoor advertising industry that are directly comparable to SearchMedia and was able to derive a basic valuation of SearchMedia from this analysis. Based on this comparable companies analysis, which is an accepted industry standard valuation methodology regularly utilized by nationally recognized, reputable investment banks for the purposes of valuation analysis, and including the financial analysis of SearchMedia that was generally used to approve the business combination, the Ideation board of directors determined that the 80% test requirement was met.

As described above, the Ideation board of directors derived a minimum equity valuation of $176.7 million for SearchMedia, based on its comparable company and multiple analyses. This value substantially exceeds the approximate $60,900,000 value required to meet the 80% test.

The Ideation board of directors believes it was qualified to perform the valuation analysis described above and to conclude that the acquisition of SearchMedia met this requirement because of the financial skills and background of several of its members.

Ideation agreed to issue to the SearchMedia shareholders and warrantholders an aggregate of 6,662,727 shares and 1,519,186 warrants at closing, and additionally 10,150,352 shares based upon the 2009 earn-out target. The value of the consideration was based on the conversion value per share of $7.8815, as projected at the time of the share exchange agreement, that would be paid out from Ideation's trust account as of November 19, 2009. The Ideation board did not give material weight to the trading value of Ideation shares of common stock as of the date of the share exchange agreement, believing that this value only represented a market-determined time value of money discount to the $7.8815 per share cash conversion value.

As discussed above, under the share exchange agreement, Ideation has agreed to pay SearchMedia shareholders 10,150,352 additional ordinary shares if ID Cayman's Adjusted Net Income ("as defined in the share exchange agreement) for the fiscal year ending December 31, 2009 exceeds $38.4 million.

Ideation believes that because the SearchMedia parties have significant

29

consideration subject to the earn-out target, the Ideation board of directors has sufficient guidance in earnings when determining a valuation of SearchMedia.

62. These statements were materially false and/or misleading for, among other reasons:

a. SearchMedia later admitted upon restating SMIL's historical financial results that: (i) SMIL's originally reported FY 2007 revenue of $7.8 million was overstated by approximately $6 million; (ii) SMIL's originally reported revenue for FY 2008 of $88 million was overstated by $46.9 million; and (iii) SMIL's gross profit, operating income, and net income originally reported for FY 2008 had been overstated as set forth in the below chart:

|  | Originally Reported | As Restated | Restatement Adjustment | Percent Overstated |
|---|---|---|---|---|
| Gross Profit (Loss) | $41,963,000 | $11,061,000 | ($30,902,000) | 279.4% |
| Operating Income (Loss) | $22,839,000 | ($8,237,000) | ($31,076,000) | 377.3% |
| Net Income (Loss) | $4,343,000 | ($35,080,000) | ($39,423,000) | 907.7% |

b. The Proxy/Prospectus falsely reported that SMIL's fair market value exceeded 80% of Ideation's net assets;

c. The Proxy/Prospectus failed to disclose that SMIL's revenues were massively overstated due to flagrant accounting irregularities;

d. The Proxy/Prospectus failed to disclose that Ideation had not independently verified SMIL's financial results in light of the acknowledgement that SMIL's auditor had observed deficiencies in SMIL's internal controls over financial reporting;

30

e.     The Proxy/Prospectus failed to disclose that certain of SMIL's receivables were uncollectible;

f.     The SMIL's financial projections for FY 2009 provided to Ideation investors as late as October 2009 were false and misleading.   During a conference call on April 16, 2010, Defendant Conway specifically admitted that SearchMedia had "contacted the sellers of [SMIL] to Ideation and notified them that the financial projections for 2009 provided to us and to other investors as late as October 2009, were wrong";

g.     The Proxy/Prospectus failed to disclose that by voting in favor of the transaction Ideation shareholders would actually be unknowingly voting to receive less than their fair share of the value of the assets and business of the combined entity;

h.     The apparent strength and growth of SMIL's total revenues and the revenues of its main segment, its in-elevator business, were largely the result of accounting irregularities and improper revenue recognition; and

i.     The Proxy/Prospectus failed to disclose that, based on SMIL's actual financial results, the conversion value and/or cash liquidation value of $7.8815 per share of Ideation common stock was higher than the valuation of a share of post-Merger Ideation common stock if the Merger with SMIL occurred.   In its 2009 Form 10-K, the Company disclosed that the "fair value of equity per share after the merge date October 30, 2009 was US$3.987" per share of SearchMedia.

63.     On October 27, 2009, Ideation issued a press release entitled, "Ideation Acquisition Corporation Stockholders Approve Acquisition of SearchMedia International Ltd."   In this press release, the Company announced that Ideation's "stockholders ha[d] approved all proposals related to the acquisition of [SMIL] at its special meeting of stockholders held" that day and that

31

"[s]hareholders representing 82.9% of the outstanding shares voted to approve the business combination with [SMIL] and shareholders representing fewer than 0.4% of shares issued in Ideation's initial public offering elected to convert their shares to cash."   Defendants Fried and Lee stated, in relevant part:

> "We are very pleased our stockholders have approved the transaction with SearchMedia," stated Robert Fried, President and CEO of Ideation. "We look forward to partnering with SearchMedia's management team, as it executes its aggressive growth strategy and leverages its competitive strengths in the highly attractive outdoor advertising market in China."
>
> "This business combination is a very important milestone for our Company," stated Garbo Lee, President of SearchMedia. "The capital and enhanced management resources from this business combination, along with a U.S. stock market listing, will strengthen our position in the marketplace and enable us to further pursue our strategic growth plans."

64.    Ideation shareholders consented to the Merger on the basis of, *inter alia*, the materially misleading Proxy/Prospectus, SMIL's materially false and misleading financial statements and operating results contained in the Proxy/Prospectus, and statements made to shareholders and investors in the Company's press releases and other public statements related to the Merger.

65.    Specifically, Ideation shareholders were denied their right to cast an informed vote on the Merger because Defendants' proxy solicitations, among others:

a.    Reported materially false and misleading financial information and operating results for SMIL;

b.    Falsely reported that SMIL's value exceeded 80% of Ideation's net assets;

c.    Failed to disclose that SMIL's revenues were massively overstated due to flagrant accounting irregularities;

d.    Failed to disclose that Ideation had not independently verified SMIL's

32

financial results in light of the admission that SMIL's auditor had observed deficiencies in SMIL's internal controls over financial reporting;

      e.    Failed to disclose that certain of SMIL's receivables were uncollectible; and

      f.    That SMIL's financial projections for FY 2009 provided to Ideation investors as late as October 2009 were false and misleading; and

      g.    Ideation shareholders would actually receive less than their fair share of the value of the assets and business of the combined entity upon completion of the Merger.

66.    Had Ideation shareholders known the truth regarding SMIL's financial results, the true value of SMIL's business, or any indicia of operational or accounting fraud on the part of SMIL's management and/or shareholders, Ideation shareholders would either have exercised their conversion rights or voted against the Merger, or at least not approved the transaction according to those values and/or terms. Given the proximity of the shareholder vote to the November 19, 2009, liquidation date, if the transaction had not been approved, Ideation would have lacked sufficient time to complete another business combination and each shareholder of Ideation common stock would have received approximately $7.8815 per share in cash.

    **3.**    **Defendants' Statements Following Shareholder Approval**

67.    On November 2, 2009, Ideation issued a press release entitled "Ideation Acquisition Corporation Announces Completion of Acquisition of SearchMedia International Ltd." In it, the Company announced that the Merger was consummated on October 30, 2009, and that Ideation has changed its name to SearchMedia Holdings Limited. The press release quoted Defendant Lee, who stated, in relevant part:

    "We are very proud to announce the completion of this strategic and very successful transaction with Ideation," stated Garbo Lee, President of SearchMedia. "We look forward to utilizing the capital from this transaction to execute our

growth plans and to solidify our position as a leading nationwide multi-platform media company in China."

68.    On November 5, 2009, SearchMedia filed with the SEC a Current Report on Form 8-K, which was signed on behalf of SearchMedia by Defendants Liu, Yen, Lee, and Huang.   In it, the Company's financial statements included information about SMIL's FY 2008 financial results and the Company and stated, in relevant part:

> *Revenues.*    ***Revenues increased from $31.3 million for the six-month period ended June 30, 2008 to $44.9 million for six-month period ended June 30, 2009, primarily due to rapid organic growth and acquisitions. Of this $13.6 million increase in revenues, the majority was attributable to the acquisitions and the increased number of contracts entered into with clients***. The total number of sales contracts increased from 600 for the six-month period ended June 30, 2008 to 944 for the six-month period ended June 30, 2009. As a result of the challenging business environment and the market downturn during the period, however, the average revenues per contract decreased from $52,000 for the six-month period ended June 30, 2008 to $47,000 for the six-month period ended June 30, 2009.

> *              *              *

> *Net income.*    As a result of the foregoing, ***SearchMedia had a net income of $8.9 million for the six-month period ended June 30, 2009, compared to a net income of $2.0 million for the six-month period ended June 30, 2008.***

(Emphasis added).

69.    These statements were materially false and/or misleading when made because the Company was later forced to admit that its originally reported revenues for the first six months of 2009 were overstated.   Subsequently, in April 2010, the Company admitted that it identified approximately $16 to $18 million of revenues previously reported for the first nine months of 2009, which could not be substantiated.

70.    On December 23, 2009, SearchMedia issued a press release entitled "SearchMedia Holdings Limited Announces Third Quarter 2009 Results."   In it, the Company stated in relevant

part:

Reports Third Quarter 2009 Revenue of $23.1 Million; Third Quarter 2009 Adjusted Net Income Increased 10% Sequentially to $6.8 Million

SHANGHAI, CHINA -- (Marketwire) -- 12/23/09 -- SearchMedia Holdings Limited ("SearchMedia" or the "Company") (NYSE Amex: IDI) (NYSE Amex: IDI.WS), (formerly Ideation Acquisition Corp.), one of China's leading nationwide multi-platform media companies, today announced financial results for its SearchMedia International Ltd. subsidiary for the third quarter ended September 30, 2009. The Company has included and refers below solely to the operating performance of SearchMedia International Ltd. on a stand-alone basis (excluding the combination with Ideation Acquisition Corp.) for the third quarter of 2009, as this is the clearest comparison of the underlying operations year over year.

Third Quarter 2009 Highlights

--      Total revenue in the third quarter of 2009 was $23.1 million representing a slight decrease of 2.1%, compared to $23.6 million from the second quarter of 2009.

\*       \*       \*

Ms. Garbo Lee, SearchMedia's President, stated, "***Despite the continued challenging advertising market in the third quarter of 2009, we were able to achieve net revenue of $23.1 million and our adjusted net income increased to $6.8 million. Our third quarter results demonstrate our ability to implement cost savings and find efficiencies in our business in order to improve our margins and increase our profitability. Our traditional outdoor billboard business remains stable and continues to possess a high level of occupancy, exceeding 90% during the quarter. In addition, we continue to see improvement in our subway operations as we have been able to increase occupancy and implement cost controls. In order to address the weakness in our in-elevator business, we have been focusing on higher-quality locations and have terminated many of the underperforming elevator sites in our network, resulting in a smaller but, we believe, superior elevator network. Furthermore, we are focused on enhancing the performance and integration of our elevator platform in order to achieve closer integration of our advertising sales and media site selection activities, which we believe will result in higher occupancy rates and improved profitability in the future***.***"***

Third Quarter 2009 Results

***SearchMedia's total revenue was $23.1 million in the third quarter of 2009***, a

35

decrease of 12.8% compared to $26.5 million in the third quarter of 2008 and a decrease of 2.1% from $23.6 million in the second quarter of 2009. ***The slight sequential decrease and decrease from the year-ago quarter were due to a decline in the elevator business, partially offset by increases in the billboard and subway businesses.*** SearchMedia continues to focus its efforts on cross-selling amongst its three media platforms. In the third quarter of 2009, the Company had successful multi-media campaigns with advertisers in the consumer goods, automotive, and banking and insurance industries.

Cost of revenue was $12.1 million in the third quarter of 2009, representing 52.4% of revenue, compared to $15.4 million, representing 58.1% of revenue in the third quarter of 2008, and $13.5 million, representing 57.2% of total revenue in the second quarter of 2009. The decrease in media cost was primarily due to the reduction in the Company's in-elevator network in order to focus on more profitable locations.

***Gross profit in the third quarter of 2009 was $11.0 million, approximately equal to the third quarter of 2008, and an increase of 9.0% from $10.1 million in the second quarter of 2009.*** Gross margin was 47.6% in the third quarter of 2009, up significantly compared to 41.9% in the third quarter of 2008 and 42.8% in the second quarter of 2009. The year-over-year increase in gross margin was primarily due to improvements in the Company's in-elevator network as it focused on more profitable locations.

Selling and marketing expenses were $1.3 million in the third quarter of 2009, representing a decrease of 42.9% compared to $2.2 million in the third quarter of 2008, and a decrease of 9.7% compared to $1.4 million in the second quarter of 2009. Selling and marketing expenses represented 5.4% of revenue in the third quarter of 2009 compared to 8.3% in the third quarter of 2008 and 5.9% in the second quarter of 2009. The year-over-year and sequential decrease was primarily due to tighter budget control on promotion activities and commission expenses in addition to rationalizing our sales and media development staff in mid-2009. This rationalization continued through the third quarter of 2009.

*      *      *

Business Outlook

Ms. Garbo Lee stated, "While we are pleased with our ability to improve our profitability in the third quarter of 2009, the advertising market continued to be very challenging in 2009. Traditional billboard continues to perform well with occupancy currently over 90%. ***However, revenue for our in-elevator business is performing below our expectations due to increased competition and the challenging ad market. We continue to reduce our elevator network by exiting***

36

*less lucrative and unprofitable locations, resulting in margin improvement. While we expect our traditional outdoor billboard and subway businesses to remain stable, we anticipate revenue in the fourth quarter of 2009 will be down sequentially, primarily due to the rationalization of our in-elevator business. We remain focused on implementing our strategy whereby our media site selection and advertising sales teams will become more integrated in every city. While this integration may require up to two quarters to implement fully throughout our nationwide network, we believe that this initiative will eventually result in a better quality elevator portfolio, higher occupancy rates, and improved profitability and cash flow."*

(Emphasis added).

71.     These statements were materially false and/or misleading when made because, among others, the following:

a.      The Company later admitted that the originally reported revenue for the first nine months of 2009 was overstated.  Subsequently, in April 2010, the Company admitted that it had identified approximately $16 to $18 million of revenues previously reported for the first nine months of 2009, which could not be substantiated.

b.      The Company failed to disclose that it had uncovered issues relating to SMIL's previous financial results.  As Defendant Fried admitted during a conference call with investors and analysts held on April 19, 2010: "following completion of the stock transaction in November, SearchMedia discovered operational and other issues primarily related to Jingli, the largest in-elevator division of the company."

c.      The Company failed to disclose that its efforts to address the "operational and other issues" related to Jingli had negatively impacted the Company's Q3 2009 financial results.

        d.      The Company affirmatively misrepresented the cause of the apparent weakness in its elevator business by falsely attributing the weakness to such things as the "continued challenging advertising market in the third quarter of 2009" as Defendant Lee falsely portrayed that "revenue for our in-elevator business is performing below our expectations due to increased competition and the challenging ad market."

        e.      Moreover, the failure to disclose the operational and other issues identified with respect to its elevator business rendered the Company and Defendant Lee's other statements (regarding SearchMedia's ongoing efforts to focus on higher-quality elevator locations and the elimination of underperforming elevator sites) misleading:

        i.      For example, without disclosing that the "operational and other" issues triggered the "rationalization" of its elevator business, the following statements by Defendant Lee were rendered misleading as they suggested that the termination of certain locations were purely related to a strategic decision to move to "higher-quality" locations and improve the "profitability" of the elevator segment:

"In order to address the weakness in our in-elevator business, we have been focusing on higher-quality locations and have terminated many of the underperforming elevator sites in our network, resulting in a smaller but, we believe, superior elevator network. Furthermore, we are focused on enhancing the performance and integration of our elevator platform in order to achieve closer integration of our advertising sales and media site selection activities, which we believe will result in higher occupancy rates and improved profitability in the future."

*     *     *

38

"We continue to reduce our elevator network by exiting less lucrative and unprofitable locations, resulting in margin improvement. While we expect our traditional outdoor billboard and subway businesses to remain stable, we anticipate revenue in the fourth quarter of 2009 will be down sequentially, primarily due to the rationalization of our in-elevator business."

      ii.    The misleading nature of Defendant Lee's portrayal of the "rationalization" of the elevator business is evident when juxtaposed against Defendant Conway's portrayal during an April 19, 2010, conference call:

[*Defendant Conway*:] "We restructured the in elevator business. This included management changes and rationalization of underperforming branch offices. And we improved our future ability to collect revenue for services rendered by linking sales commissions to accounts receivables collection mandating a customer validation and approval process requiring an internal contract review process, conducting systematic bad debt reviews between sales and accounting teams and strengthening documentation for services rendered. We now have a stronger team in place, greater transparency in our finance and accounting function, and importantly greater ability to collect revenue for services rendered."

      iii.    The "operation and other issues" linked to Jingli turned out to be far more than issues with unprofitable locations. Rather, as admitted by the Company's Restatement, SearchMedia identified "a number of fictitious or questionable sales contracts in our in-elevator business, along with related accounts receivable collections and various payments, which originated primarily from Jingli." "Apparent fictitious business transactions, forged contracts and monitoring reports resulted were identified in overstated revenue of $23,692,000."

72.    On the news that the Company's revenue from its in-elevator business was performing below the Company's expectations due to increased competition and the challenging

ad market, as well as forecasted elevator revenue declines resulting from exiting less lucrative/profitable locations, SearchMedia's stock fell $0.55 per share, or nearly 6.5%, to close on December 23, 2009, at $7.95 per share, on unusually heavy trading volume.   SearchMedia's warrants declined $0.60 per warrant, or 20.69%, to close on December 23, 2009, at $2.30 per warrant.   Unbeknownst to investors at that time, the real reason for the weakness in the Company's elevator business in Q3 2009 and forecasted elevator revenue declines was related to the Company's efforts to address the "operational and other issues" primarily related to Jingli, which had negatively impacted the Company's Q3 2009 financial results and would continue to impact the Company's quarterly elevator revenues going forward.

**4.** **Defendants' Statements About the Financial Issues With SearchMedia**

73.   On March 31, 2010, the Company issued a press release entitled, "SearchMedia to File Form 12b-25 Related to Form 10-K Filing."   The Company stated, in relevant part:

SHANGHAI, CHINA--(Marketwire - 03/31/10) - SearchMedia Holdings Limited ("SearchMedia" or the "Company") ("MEX:IDI - News") ("MEX:IDI.WS - News"), one of China's leading nationwide multi-platform media companies, intends to file a Form 12b-25 with the Securities and Exchange Commission on April 1, 2010, to delay the filing of its Annual Report on Form 10-K for the year ended December 31, 2009.

***SearchMedia's review of 2009 financial results is taking longer than anticipated as the Company is assessing the materiality of certain uncollectible accounts receivable related to sales generated primarily in the in-elevator business, which the Company believes will likely result in significant adjustments from previously disclosed estimated financial results for 2009. The Company has begun discussions with several of the original SearchMedia shareholders to address appropriate remedies, which may include cancellation of some of the shares issued in the Share Exchange Agreement. In completing the 2009 financial results, the Company also needs additional time to complete its review of the reverse capitalization structure and other matters which are still being reviewed.***

Paul Conway, Chief Executive Officer of SearchMedia, stated, ***"During the preparation of our 2009 year-end financial statements, we determined that some***

*of the accounts receivable primarily related to the in-elevator business may not be collectible. This could materially impact our revenue and net income for 2009, and as such, we believe it is prudent that we extend our financial audit beyond the March 31, 2010 filing deadline for our Fiscal Year 2009 annual report. We expect to release our 2009 year-end financial results by April 15th, 2010.*

*Conway continued, "While this situation is disappointing, our senior team, including myself and other recent strategic hires, have quickly and significantly enhanced our internal controls and processes. New staff at our in-elevator business has helped to rationalize the operations and resume growth.* Our billboard and subway business remains strong and we continue to build our revenue base and expand our presence in China through new concessions which will increase profitability in 2010. The Company has also made significant progress on new organic and acquisition growth opportunities, in addition to entering into new long-term agreements with management of our operating subsidiaries to enhance the long term growth of our company."

The complete and final results of the Company's assessment of its internal controls and financial results will be disclosed in its Annual Report on Form 10-K for the year ended December 31, 2009.

(Emphasis added).

74.     On this news, SearchMedia's stock fell $0.41 per share, or approximately 8.7%, to close on April 1, 2010, at $4.30 per share, on unusually heavy trading volume.  Similarly, SearchMedia's warrants declined $0.25 per warrant, or 25%, to close on April 1, 2010, at $0.75 per warrant.

75.     Nevertheless, the statements contained in  March 31, 2010 press release were materially false and/or  misleading because, among other reasons:

        a.      The Company's financial results for FY 2007 and FY 2008 were materially overstated and would have to be restated; and

        b.      The statements failed to disclose the fraudulent nature of SMIL's prior financial results, the magnitude of the accounting irregularities, and the extent to which SMIL had been overvalued for purposes of the Merger.

41

76.   On April 16, 2010, the Company issued a press release entitled, "SearchMedia Provides Preliminary Full Year 2009 Unaudited Financial Results and Operational Update." SearchMedia stated, in relevant part:

> SHANGHAI, CHINA--(Marketwire - 04/16/10) - SearchMedia Holdings Limited ("SearchMedia" or the "Company") ("MEX:IDI - News") ("MEX:IDI.WS - News"), one of China's leading nationwide multi-platform media companies, today provided an operational update and preliminary unaudited financial results for the full year 2009. The Company also provided financial guidance for the full year 2010.
>
> Rob Fried, Co-Chairman of the Board of Directors of SearchMedia, commented, "Following the completion of the SPAC transaction, *we discovered operational and other issues primarily relating to the Shanghai Jingli Advertising Company Limited ("Jingli") in-elevator division of the Company. In response, we quickly brought new, reliable senior management to the Company and worked to assess the depth and magnitude of the issues. In accordance with our findings, we may reverse approximately $16 to $18 million of revenues previously reported for the first nine months of 2009, which could not be substantiated in our year-end review. We have also made other important changes, including restructuring the in-elevator division personnel and management processes to enhance stability, revenue collectability and business transparency going forward."*
>
> Paul Conway, Chief Executive Officer of SearchMedia, remarked, "Despite the issues caused under prior management, we still have been able to realize significant progress in our new business development efforts thus far in 2010. We have several transactions in progress that will better align interests between subsidiaries and shareholders, create additional long-term revenue opportunities, strengthen and diversify our service suite in China's media sector, and enhance our national presence through accretive transactions. We intend to keep our investors up to date and make additional announcements as these endeavors evolve. Importantly, our outdoor billboard and transit businesses were strong in the first quarter of 2010, and we believe the prospects for 2010 and beyond are excellent."
>
> Preliminary Unaudited Financial Results and Other Matters
>
> Today, the Company is providing preliminary unaudited financial results for the full year 2009, which reflect the impact of a potential significant revenue reversal and other extraordinary items primarily related to the Company's business conducted through Jingli.
>
> *For the full year 2009, the Company anticipates $64 to $66 million in revenue,*

42

*after giving effect to the aforementioned $16 to $18 million revenue reversal. The Company's operating profit and net income were significantly impacted because, despite the reversal, the Company was obligated to recognize the associated costs of revenues and operating expenses in full. Assuming the effect of the revenue reversal, but before additional bad debt reserve and a write-off of fixed assets and under-accrued liabilities discussed below, the Company estimates operating profit to be approximately $1 to $3 million and net loss to be approximately $6 to $8 million.*

Based on currently available estimates, the Company expects to provide for a $7 million additional bad debt reserve for sales primarily generated prior to 2009 and to write off $6 million of fixed assets and other assets and under-accrued liabilities. The effect of these extraordinary charges and adjustments is to decrease the Company's estimated results of operations to an operating loss of $10 to $12 million and to increase its estimated net loss to approximately $19 to $21 million.

As of December 31, 2009, the Company had approximately $30 million in cash and cash equivalents, and approximately 20.7 million common shares outstanding.

*Excluding allocation of corporate overhead and the entire Jingli business, where most of the revenue reversal and extraordinary items occurred, SearchMedia believes it generated approximately $54 to $56 million in revenue and $15 to $16 million in net income for the full year 2009 from its other operating subsidiaries. These results reflect strong revenue performance and profitability at the Company's subsidiaries.*

Wilfred Chow, Chief Financial Officer of SearchMedia, stated, "*We are aggressively pursuing collection of receivables across the Company, even including those deemed uncollectible in 2009. Additionally, we provided our preliminary 2009 financial results excluding the Jingli business and allocation of corporate overhead to facilitate an accurate understanding of our subsidiary operations*."

Chow continued, "Also note that as of the market close on April 14, 2010, SearchMedia had approximately 22 million fully diluted shares outstanding, and this is before any potential cancellation of shares from the Share Exchange Agreement that we are currently pursuing."

*Paul Conway continued, "We believe lack of oversight, inadequate customer approval procedures, staff turnover and poor record keeping under prior management in 2009, among other things, led to a high receivables risk. In the past few months, we took steps to dramatically tighten internal controls and vigorously pursue the collection of receivables. As a result of potential misrepresentations related to the business, we continue to pursue all legal*

43

*remedies available to the Company and we are continuing discussions with several of the original SearchMedia shareholders to address potential remedies, including cancellation of some of the shares issued in the Share Exchange Agreement."*

*Previously, the Company had received anonymous letters claiming fraudulent activities at its operation in China. In connection with these letters, a special committee of the SearchMedia board of directors engaged independent counsel and forensic accountants to assist it conducting an extensive investigation into the claims made in these anonymous letters. As of the date of this release, the investigation has been substantially completed and management has implemented many remedial actions, including those discussed below, to strengthen internal controls and procedures and to address some of the issues identified during the investigation.*

In the first quarter of 2010, SearchMedia began implementing many operational improvements including but not limited to the following:

*-- Enhancing the senior management team with the hiring of a new CEO and CFO and the addition of in-house corporate counsel*;

*-- Strengthening the finance and accounting function with the addition of a Vice President of Finance and a focus on better utilization of accounting systems between the parent company and subsidiaries;*

*-- Restructuring of the in-elevator business, including management changes and rationalization of underperforming branch offices; and*

*-- Improving the Company's future ability to collect revenue for services rendered by linking sales commissions to accounts receivable collection, mandating a customer validation and approval process, requiring an internal contract review process, conducting systematic bad debt reviews between sales and accounting teams, and strengthening documentation of services rendered.*

*    *    *

"*Importantly, we remain confident in our ability to further SearchMedia's growth. As of today, we are estimating revenue of approximately $85 million in 2010 and net income of approximately $18 million. This is up substantially from the results we announced today, driven by continued organic growth across our media platforms, geographic expansion, and select potential new concessions and acquisitions*," said Conway.

Timing of 10K Filing

44

The Company believes that it cannot complete the disclosure necessary for its Annual Report on Form 10-K within the extended filing deadline of April 15, 2010. The Company intends to file its Annual Report on Form 10-K by May 17, 2010. The preliminary financial results presented above are subject to the final resolution of the operational issues described above and completion of the audit by the Company's independent auditors. Accordingly, the audited results presented in the Company's Annual Report on Form 10-K may differ materially from these preliminary results.

Mr. Chow concluded, "We appreciate the patience of our stockholders as we work to complete our financial reporting process. As the Company is continuing to fully assess the extent of the financial impact of the operational and other issues discovered during the year-end review, we believe that it is prudent to further delay our filing until we fully complete our review. Furthermore, we believe our decision to conduct a thorough and diligent review now will allow us to provide shareholders with more accurate and consistent information going forward."

(Emphasis added).

77.     Nevertheless, the statements contained in the April 16, 2010 press release were materially false and/or misleading when made because, among other reasons:

a.     The Company's financial results for FY 2007 and FY 2008 were materially overstated and would have to be restated;

b.     The Company failed to disclose the fraudulent nature of SMIL's prior financial results, the magnitude of the accounting irregularities, and the extent to which SMIL was overvalued for purposes of the Merger; and

c.     Contrary to the Company's claim that FY 2009 revenue would be in the range of $64 to $66 million, and net loss would be approximately $6 to $8 million, in the Company's Form 10-K for 2009, the Company reported revenues of $37,741,000 and a net loss of $22,649,000.

78.     On May 24, 2010, the Company issued a press release entitled, "SearchMedia

Announces First Quarter 2010 Preliminary Unaudited Financial Results." In it, SearchMedia stated, in relevant part:

Preliminary Unaudited Financial Results

*For the 2010 first quarter, the Company anticipates $13 million in revenue and approximately $1 million in net income.*

Revenue was driven primarily by our existing billboard and transit businesses. Revenue in the 2010 first quarter did not benefit from our announced billboard acquisition or new bus concession.

*Net income was driven by continued profitability of our billboard and transit businesses, which was partially offset by losses from the Shanghai Jingli in-elevator business and corporate overhead costs.*

As of March 31, 2010, the Company had approximately $22 million in cash and cash equivalents, and approximately 20.7 million basic common shares outstanding. During the first quarter, cash of approximately $4 million was utilized as part of the previously announced share and warrant buyback program.

For comparative purposes, the Company intends to release 2009 quarter by quarter results in its Annual Report on Form 10-K.

Speaking about the preliminary financial results, Wilfred Chow, Chief Financial Officer said, "*The Company was able to deliver positive net income during the 2010 first quarter in spite of the usual seasonality in the industry where the first quarter is traditionally the slowest quarter of the year. Net income was achieved through tighter cost controls, the Shanghai Jingli elevator business operating at a lower loss when compared with last year and no significant financial write-offs in the first quarter of 2010.*"

Paul Conway continued, "*Our business was profitable in the 2010 first quarter, however, there were two primary items that adversely affected the revenue performance of the overall company. The Company's Shanghai Jingli in-elevator business experienced a bottoming-out during the first quarter of 2010 due to the restructuring effort we implemented at the business and stricter credit procedures prior to accepting new clients. We believe the scalability of the in-elevator business remains an attractive growth prospect and expect the business to become profitable in the 2010 third quarter. Also, one of our subsidiaries had some delays in certain advertising campaigns which resulted in the recognition of these revenues in the 2010 second quarter.*

46

"Our outdoor billboard and transit businesses remain solid, with our subsidiaries delivering approximately $3 million in net income in the first quarter, which excludes Shanghai Jingli and corporate expenses. We remain confident of the growth prospects of our businesses for the full year. Furthermore, during the course of the second quarter we have seen greater deployment of 2010 advertising budgets from our clients.

"With the anticipated business developments including new contracts, additional concessions and expected acquisition closings we remain confident in our ability to achieve revenue of approximately $85 million and net income of approximately $18 million for the full year 2010."

(Emphasis added).

79.     Nevertheless, the statements contained in the May 24, 2010 press release were materially false and/or misleading when made because, among others:

a.     The Company's financial results for FY 2007 and FY 2008 were materially overstated and would have to be restated.

b.     The Company failed to disclose the fraudulent nature of SMIL's prior financial results, the magnitude of the accounting irregularities, and the extent to which SMIL was overvalued for purposes of the Merger.

c.     Contrary to the Company's preliminary Q1 2010 revenue of $13 million in revenue and approximately $1 million of net income, for Q1 2010, the Company ultimately reported revenues of $8,472,000 and a net loss of $3,356,000.

## B.     Disclosures at the End of the Class Period

80.     On August 20, 2010, SearchMedia issued a press release titled, "SearchMedia Releases Second Quarter 2010 Preliminary Unaudited Financial Results."   The Company stated, in relevant part:

Intention to Restate 2007 and 2008 Financials

Wilfred Chow, Chief Financial Officer of SearchMedia, stated, "As a result of our continued internal analysis of our financial statements for the year ended December 31, 2009, based on management's recommendation, the Audit Committee has concluded that the historical financial statements of SearchMedia International Limited for the 2007 and 2008 fiscal years should be restated and that the financial statements from these periods can no longer be relied upon. *We estimate that revenue in 2007 and 2008 was overstated by approximately $6 million and $25 million, respectively, and we are still evaluating the impact to reported net income during those periods*. At this time, we expect the 2007 and 2008 restatements to have a positive effect on the previously reported unaudited net income for the year ended December 31, 2009 and for the quarter ended March 31, 2010."

Conway commented, "In connection with our Plan of Compliance with the NYSE/AMEX that was accepted in June 2010, the NYSE/AMEX granted the Company an extension to file its Form 10-K for the year ended December 31, 2009 until August 31, 2010. While we continue to endeavor to file our Form 10-K on or prior to August 31, 2010, it is unlikely that we will meet this deadline due to the restatement of the 2007 and 2008 financial statements of SearchMedia International Limited. We have submitted a request to the NYSE/AMEX for an additional extension and are awaiting their decision. *We remain fully committed to bringing the Company into compliance with Sections 134 and 101 of the NYSE Amex LLC Company Guide." Conway continued, "Since the new management team began working at SearchMedia Holdings earlier this year, we have made significant progress implementing remedial actions to strengthen our internal controls and procedures. We continue to actively address some of the issues identified during the previously reported special committee's investigation and management's further analysis, including strengthening the Company's management, finance and accounting functions, restructuring the in-elevator business, and improving the Company's accounts receivable and documentation control systems. We continue to pursue all remedies available to the Company, including legal remedies and potential cancellation of some of the shares issued in the Share Exchange Agreement.* As of today, there are approximately 22 million fully diluted shares outstanding, of which approximately 9 million were issued to the pre-merger shareholders."

(Emphasis added).

81. On this news, SearchMedia's stock fell $0.78 per share, or nearly 23%, to close on

August 20, 2010, at $2.62 per share on unusually heavy trading volume, and further declined an

additional $0.92 per share, more than 35%, to close on August 23, 2010, at $1.70 per share, again on unusually heavy trading volume.   Over the course of these two days of trading, SearchMedia's stock declined a combined $1.70 per share, or 50%, from the closing price of $3.40 per share on August 19, 2010.

C.    **SearchMedia/SMIL's Violation of GAAP In Financial Statements Filed With the SEC**

82.    These financial statements and the statements about SMIL's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of SMIL or SearchMedia's operations due to the Company's revenue recognition and accounting in violation of GAAP rules.

83.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.   Regulation S-X (17 C.F.R. § 210.401(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

84.    The fact that SearchMedia restated SMIL's financial statements, and informed investors that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No.20, 7-13; SFAS No. 154, 25).

85.    Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

a.   The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, 10);

b.   The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, 34);

c.   The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, 40);

d.   The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, 42);

e.   The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, 50);

f.   The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, 58-59);

g.   The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and

50

conditions" was violated (FASB Statement of Concepts No. 2, 79); and

    h.   The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, 95).

86.    The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. § 229.303).

## VI.   SCIENTER ALLEGATIONS

87.    As detailed herein, Defendants acted with scienter in that Defendants knew or were severely reckless in not knowing that the public documents and statements issued or disseminated in the name of SearchMedia and/or SMIL were materially false and/or misleading; knew or were severely reckless in not knowing that such statements or documents would be issued or disseminated to the investing public; and knowingly, or with severe and reckless disregard for the truth, participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As also described herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding SearchMedia and/or SMIL, his/her control over, and/or receipt and/or modification of SearchMedia and/or SMIL's allegedly materially misleading misstatements and/or their associations with the Company and/or SMIL which made them privy to confidential proprietary information concerning SearchMedia and/or SMIL, participated in the fraudulent scheme alleged herein.

88.    Defendants knew or severely and recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.   The

ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without knowledge and complicity of the personnel at the highest level of the Company and SMIL, including the Individual Defendants.

89.    Defendants' scienter is further reflected by, among others, the Defendants' admissions, Defendants' respective financial motives to proceed with the Merger, and the flagrant nature of the fraud in the face of the Ideation Defendants' expertise in conducting acquisitions and purported extensive due diligence:

**A.    The SMIL Defendants' Scienter**

**1.    The Company and the Ideation Board Indicate that SMIL and the SMIL Defendants Acted with Scienter**

90.    On November 1, 2010, SearchMedia filed its Annual Report on Form 10-K with the SEC for the 2009 fiscal year.   In it, the Company finally provided restated financial statements for FY 2008, finally disclosed the extent of the accounting irregularities, and in relevant part, disclosed:

> The Audit Committee has also recommended that the Board and senior management consider possible remedial actions against those who may have been aware of or involved in the subject transactions. Pursuant to this recommendation, the Company is preparing indemnification claims against the former shareholders and directors of SearchMedia International and Linden Ventures II (BVI), LTD ("Linden") for losses and damages it has incurred or will incur as a result of these financial and operational improprieties and for breaches of various covenants, representations, and warranties contained in the share exchange agreement governing the Business Combination.  On October 28, 2010, we entered into a tolling agreement with the representatives of SearchMedia International shareholders and Linden extending the deadline by which claims for indemnification by the Company must be made to November 12, 2010.

91.    The Company has acknowledged and conceded that the SMIL Defendants acted with scienter.   SearchMedia has commenced claims against the former shareholders and directors

of SMIL (*i.e.*, the SMIL Defendants) for fraud.  Specifically, in March of 2011, Defendant Conway indicated that "in order to put to rest the legacy issues from the previous owners and management team, in February 2011 [SearchMedia] commenced claims against the former shareholders and directors of [SMIL] for fraud and for breaches of representations, warranties and covenants contained in the Share Exchange Agreement."

92.     In doing so, the Company concedes that it acted with scienter when any of the SMIL Defendants made false and misleading statements and/or omissions after the Merger in their capacities as officers and/or directors of SearchMedia.  *See e.g.*, Section V, above.

**2.      The SMIL Defendants' Financial Motive to Conceal Material Facts**

93.     The SMIL Defendants were highly motivated to misrepresent the financial results and operations of SMIL in order to complete the Merger.  Upon the closing of the Merger, affiliates or immediate relatives of certain directors and officers of SMIL were expected to, in aggregate: (1) beneficially own 1,351,445 ordinary shares of ID Cayman; (2) hold warrants to purchase 855,739 ordinary shares of ID Cayman; (3) hold certain promissory notes the principal amount of which will be converted to (i) 190,320 ordinary shares of ID Cayman and (ii) 190,320 warrants of ID Cayman (each of such warrants to purchase 0.25 of an ordinary share of ID Cayman at an exercise price per ordinary share of $7.8815 rounding up to the nearest whole share); and (4) an option to purchase 40,522 ordinary shares of ID Cayman. Such persons were expected to beneficially own up to 2,738,196 additional ID Cayman ordinary shares pursuant to an earn out provision in the share exchange agreement based on the adjusted net income of the combined company for the fiscal years ending December 31, 2009.

94.     According to the Proxy/Prospectus, based on the trading price of Ideation common

53

stock at September 28, 2009, and using the treasury method of valuation of the warrants, options, and restricted share awards to be issued, the aggregate value of the securities to be issued as consideration at the closing of the Merger (inclusive of the maximum number of earn out shares to be issued) was $156.7 million.

**B.**     **Ideation's Scienter and the Ideation Defendants' Scienter**

     **1.**     **The Ideation Board Held Themselves Out As Experts In Acquiring Company's and Conducting Due Diligence**

95.     Ideation and the Ideation Defendants were charged with one basic operation: to acquire a company with the funds raised via Ideation's IPO.  The reason why investors were willing to fund them with $80 million was because of the Ideation Defendants' financial sophistication and experience with finding target companies, conducting due diligence, negotiating transactions, and completing acquisitions.

96.     In connection with the IPO in November 2007, Ideation and the Ideation Defendants held themselves out as sophisticated veterans in the arena of mergers and acquisitions and conducting due diligence.   For example, identified as two of only five "competitive strengths" in the Company's registration statement and prospectus for its IPO were the following:

     a.     "*Extensive track record with mergers and acquisitions*."   Specifically, the Company claimed that its "management team, including [its] officers and directors, and special advisors, have experience in all phases of acquisition and growth in financing transactions in both the public and private market."   The prospectus highlighted that Defendants Rubin, Uppaluri, and Frost, were responsible for the due diligence, structuring, negotiating and closing of numerous transactions.

     b.     "*Management operating experience.*"   Specifically, the Company claimed

this strength "also assists us in evaluating whether acquisition targets have the resources necessary to operate as publicly traded companies."

97.    Further, the prospectus for Ideation's IPO claimed that in "evaluating a prospective target business, ***we will conduct an extensive due diligence review which will encompass, among other things, meetings with incumbent management and inspection of facilities, as well as review of financial and other information which is made available to us***."   (Emphasis added). Indeed, the Ideation Defendants portrayed themselves as so sophisticated that Ideation represented that "[t]his due diligence review will be conducted either ***by our management or by unaffiliated third parties*** we may engage, although ***we have no current intention to engage any such third parties***."   (Emphasis added).

98.    As evidence of their financial acumen, the Ideation Defendants opted to perform the analysis of SMIL's fair market value on their own without obtaining an independent fairness opinion.   Pursuant to Ideation's Amended and Restated Certificate of Incorporation, the target business that Ideation acquired or merged with had to have a fair market value equal to at least 80% of Ideation's net assets at the time of such acquisition/merger, determined by the Ideation board of directors based on standards generally accepted by the financial community, such as actual and potential sales, earnings, cash flow and book value.   The Ideation Defendants recklessly represented in the Proxy/Prospectus that the acquisition of SMIL satisfied the "requirement that any business acquired by Ideation have a fair market value equal to at least 80% of Ideation's net assets at the time of acquisition, which assets shall include the amount in the trust account."   In representing that Ideation satisfied this requirement, the Ideation Defendants stated that the "Ideation board of directors believe[d] it was qualified to perform the valuation analysis

described above and to conclude that the acquisition of SearchMedia met this requirement *because of the financial skills and background of several of its members*."  (Emphasis added).  Moreover, Ideation claimed "*[b]ased upon the Ideation board of directors' experience in performing due diligence of acquisition targets and in valuing companies*, Ideation did not obtain a fairness opinion with respect to the business combination and did not believe that a fairness opinion from an independent source was necessary."  (Emphasis added).

### 2.    The Ideation Defendants' Purported "Extensive" Due Diligence

99.    In "unanimously conclud[ing] that the share exchange agreement, as amended, with [SMIL]" was "in the best interests of Ideation stockholders" the Ideation Defendants represented that they had conducted due diligence of SMIL.  Indeed, the Proxy/Prospectus claimed that "the Ideation board of directors believed, and continues to believe, the projections for SearchMedia's business are reliable, based on Ideation's *extensive due diligence*."  (Emphasis added).  Moreover, as part of the Share Exchange Agreement, the Ideation Board agreed that "Ideation [was] taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts)" regarding SMIL.

100.    The Proxy/Prospectus details the specific participation of Defendants Uppaluri, Rubin, and Fried, and the various members of the Ideation Board in the due diligence of SMIL. For example:

a.    "On November 24, 2008, Mr. Uppaluri and Mr. Rubin, and Mr. Fried via telephone, Akerman Senterfitt, Ideation's legal advisor, and Ideation's financial advisor met with Mr. Yen and Ms. Lee at Ideation's offices in Miami, Florida. Ms. Huang, also

participated via conference call. The meeting was primarily a discussion of SearchMedia's operations, the overall Chinese outdoor advertising industry, and a review of due diligence matters related to SearchMedia's financial and accounting matters."

     b.     "From December 3, 2008 to December 5, 2008, Messrs. Fried, Uppaluri, and Rubin and Ideation's financial advisor traveled to SearchMedia's headquarters in Shanghai, China, to meet with the management team, review diligence items and tour the facilities. Discussions with SearchMedia management included growth in the Chinese out-of-home advertising market, industry trends, historical and projected financial performance, business segments, competitors, recent acquisitions, contract management, and staffing.   The Ideation team also met with select customers of SearchMedia to discuss their experiences with the SearchMedia team and proposed advertising budget going forward."

     c.     "From November 2008 through February 2009, Ideation and Jun He Law Offices, a PRC law firm engaged by Ideation, conducted due diligence on SearchMedia's operations, financials, management team, and the China outdoor advertising industry."

     d.     "On March 27, 2009, Ideation engaged BDO China Shu Lun Pan Certified Public Accountants, or BDO, *to conduct a management and internal controls review on the audited/unaudited financial statements of the largest subsidiaries of SearchMedia, including review and assessment of financial performance, policies, procedures and reporting and organizational structures, contractual commitments and relationships with SearchMedia*."   (Emphasis added).

     e.     "On March 29, 2009, Ideation, BDO and Ideation's financial advisor

conducted telephone interviews with the management of *select* subsidiary companies."
(Emphasis added).

101.     Even though it was only on March 27, 2009, that Ideation engaged BDO China Shu Lun Pan Certified Public Accountants ("BDO CSLP"), on March 31, 2009, the Ideation Board unanimously resolved to approve the proposed acquisition and authorized Ideation's management to execute the share exchange agreement and make all appropriate filings.

102.     Highly suspicious and indicative of the Ideation Defendants' scienter is the noticeable absence of any further reference in the Proxy/Prospectus to the engagement of BDO CSLP.   At the time the Proxy/Prospectus was issued, the lack of any further references to BDO CSLP's engagement (*i.e.*, no indication of any further communications with the Ideation Board or anything relating to their work pursuant to the engagement) was neither noticeable nor would it have seemed suspicious.   With the benefit of the extensive laundry list of accounting improprieties and internal control issues that accompanied the Restatement, this omission is now obvious given that the scope of the engagement (*e.g.*, "to conduct a ***management and internal controls review on the audited/unaudited financial statements of the largest subsidiaries of SearchMedia, including review and assessment of financial performance, policies, procedures and reporting*** and organizational structures, contractual commitments and relationships with SearchMedia") went directly to the heart of the fraud and accounting irregularities at SMIL that purportedly went undetected by the Ideation Defendants until immediately after the Merger was completed.

103.     The lack of any further reference in the Proxy/Prospectus to the engagement of BDO CSLP is even more suspicious considering that the Ideation Board was aware that, as

disclosed in the Proxy/Prospectus, SMIL's independent auditor had identified control deficiencies in SMIL's internal controls and the Proxy/Prospectus represented that SMIL was working to improve its internal controls over financial reporting.   Given SMIL's acknowledged internal control issues and the Ideation Board's high level of financial sophistication and merger and acquisition experience, the Ideation Board would undoubtedly be highly attune to the work of BDO CSLP.

**3.      The Ideation Defendants Represented there was Sufficient Due Diligence to Protect Against Risks of Doing Business in China and the Potential For Fraud**

104.    Not only did the Ideation Defendants hold themselves out as due diligence experts and also claim to have conducted "extensive due diligence" of SMIL, but they went one step further.  The Ideation Defendants represented that in the process of conducting due diligence, they were cognizant of the widely recognized concerns about the potential for fraud in acquiring a Chinese company.   For example, an analyst report issued on April 23, 2010, by Gilford Securities entitled, "Management Defrauded, Acquisition in Question; Downgrade to Sell," expressed dismay by the what transpired given that the Ideation Defendants claimed they were thoroughly reviewing every aspect of SMIL:

> 1. Sponsor Management Buys an Operation with Significant Fraud SearchMedia Holdings (Symbol:IDI) was formed *for the specific purpose of making an acquisition*. It was a SPAC. Therefore, shareholders had a reasonable expectation to believe that the sponsor group was sufficiently capable of doing complete and adequate due diligence prior to consummating the acquisition. After all, it was their sole purpose for being.
>
> ***Clearly dealing in China raises the specter of potential fraud. Thus investors were reasonable to assume that diligence was being undertaken with greater care. We asked about the potential for fraud, the potential for bartering transactions, and the degree of diligence on multiple occasions. We were told by the sponsor that multiple audits were being conducted to verify that each and every aspect of the company was clean.***

*Here we are less than six months after the closing of the deal, and the first three month reporting period has over 20% of the Company's revenues being reversed because they could not be substantiated! Yet the operating expenses and COGS related to these unsubstantiated sales remain. As well, a bad debt expense reserve for sales made prior to 2009 has to be taken, as well as writing off $6 million of fixed assets and other asset and under-accrued liabilities.*

*The sponsor management has failed to meet their fiduciary duty in this transaction.* They are clearly in a very vulnerable position. To make matters worse, the banker that advised the sponsor on this acquisition and earned his firm a $2MM fee, Paul Conway, is now the CEO of SearchMedia. He has never run a business in China, nor does he speak Chinese. So it will now be very difficult to go after the deepest pocket in the deal for financial remedies. The sponsor is going after the selling shareholders of SearchMedia. Experience in China suggests that this will be unsatisfying to shareholders.

2. Downgrade to Sell

We fully expect a shareholder lawsuit to be filed at some point in time. We cannot discount the possibility that there are other problems that the sponsor has yet to uncover. Prudence suggests that we step aside given the nature and magnitude of the problems. Also, earnouts that require share issuance still have to be paid, diluting what earnings may be real.

We certainly have no faith in current financial projections. Thus producing an earnings model at this juncture is simply not a worthwhile endeavor. We refuse to be newspaper reporters. We have no price target at this point in time.

(Emphasis added).

105.    As highlighted by the April 23, 2010, Gilford Securities analyst report, the extent, size, and nature, of the accounting irregularities at SMIL cannot be plausibly reconciled with the Ideation Defendants' expertise in conducting due diligence and the Ideation Defendants' claims to have conducted "extensive" due diligence.

a.    **The Magnitude of the Accounting Adjustments**

106.    The Restatement's impact on SMIL's previously reported FY 2007 and FY 2008 revenues were staggering.  For example, $6 million of the Company's $7.8 million originally

60

reported FY 2007 revenues had been improperly recognized as revenue.   Just as staggering, more than half the Company's $88 million originally reported FY 2008 revenue, or $46.9 million, had been improperly recognized as revenue.

107.   The Restatement further reveals that contrary to the portrayal of SMIL as a profitable company generating positive net income, SMIL was not profitable.   Whereas SMIL originally appeared to generate positive net income, gross profit, and operating income for FY 2008, the impact of the restatement resulted in massive losses for FY 2008.   For example, the restatement wiped out more than $39.4 million of income that transformed the Company's $4.3 million net income into a massive $35 million net loss:

|  | Originally Reported | Restated | Adjustment | Percent Overstated |
|---|---|---|---|---|
| Gross Profit (Loss) | $41,963,000 | $11,061,000 | ($30,902,000) | 279.4% |
| Operating Income (Loss) | $22,839,000 | ($8,237,000) | ($31,076,000) | 377.3% |
| Net Income (Loss) | $4,343,000 | ($35,080,000) | ($39,423,000) | 907.7% |

### b.    Revenues Could Not Be Substantiated

108.   Even more shocking than the sheer size of the Restatement's impact on SMIL's previously reported FY 2007 and FY 2008 financial results, is that the majority of the $46.9 million improperly recognized revenue in FY 2008 involved flagrant accounting irregularities. The Restatement revealed that a substantial portion of the improper revenue recognition was related to, among others, undocumented or fictitious transactions, transactions that simply lacked business substance, and related party transactions.

109.    For example, the Restatement revealed a "***number of fictitious or questionable sales contracts*** in [SMIL's] in-elevator business, along with related accounts receivable collections and various payments, which originated primarily from Jingli."   (Emphasis added). According to the Company, the "***[a]pparent fictitious business transactions, forged contracts and monitoring reports*** resulted were identified in overstated revenue" ***of more than $23.6 million for FY 2008***. (Emphasis added).

110.    Approximately $7.2 million of additionally improperly recognized revenue in FY 2008 related to the identification of "[n]umerous subway light box advertising contacts that appear to be overstated" that resulted in overstated revenue due to "***Fictitious or questionable documentation regarding the delivery of services and the lack of business substance***." (Emphasis added).

111.    Additionally, another $14.4 million of improperly recognized revenue was caused by the "***[f]ailure to properly disclose, approve and document transactions among related entities***, which resulted in the overstatement of sales and costs of these companies in the operating results of [SMIL's] subsidiaries." (Emphasis added).

### c.    SMIL's Non-existent Allowance for Doubtful Accounts

112.    Inexplicably, despite the fact that immediately after the Merger that SearchMedia claims to have first identified massive quantities of uncollectible receivables and later indicated that $46 million of the Company's originally reported $88 million in FY 2008 revenues had been improperly recognized as revenue, the Proxy/Prospectus indicated that SMIL's allowance for doubtful accounts ("ADA") as of December 31, 2008, ***was only $1,469,000***, and indicated that SMIL had not written off any uncollectible amounts during FY 2007 or FY 2008 and its accounts

receivable net of its allowance for doubtful accounts was in excess of $37 million as of the end of FY 2008.

113.     While the Proxy/Prospectus described SMIL's allowance for doubtful accounts as "management's best estimate of the amount of probable credit losses in SearchMedia's existing accounts receivable," the ability of massive amounts of uncollectible receivables and improperly recognized revenue to go unnoticed during the Ideation Defendants' "extensive due diligence" is inexplicable in light of the Proxy/Prospectus' indication that SMIL's allowance for doubtful accounts was essentially non-existent.

### d.     SMIL's Utter Lack of Internal Controls

114.     When purportedly conducting their "extensive" due diligence, Ideation and the Ideation Defendants were admittedly aware that there were previously identified problems with SMIL's internal controls.   The Proxy/Prospectus contained a purported risk warning regarding prior material weaknesses in SMIL's internal controls previously identified by SMIL's independent auditor.   Nevertheless, Ideation also highlighted that "following the identification of these internal control deficiencies," SMIL "undertook certain remedial steps to address certain deficiencies":

> In connection with the audit of SearchMedia's consolidated financial statements as of December 31, 2007 and December 31, 2008 and for the period from February 9 to December 31, 2007 and for the year ended December 31, 2008, SearchMedia's independent auditors identified a number of significant control deficiencies in its internal control procedures which, in the judgment of its independent auditors, adversely affect its ability to initiate, authorize, record, process and report financial data reliably in accordance with generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of its consolidated financial statements that is more than inconsequential will not be prevented or detected. ***Specifically, the significant control deficiencies identified by SearchMedia's independent auditors related to: (1) shortage of experienced accounting and finance personnel with adequate knowledge in US GAAP and***

> ***SEC reporting requirements; (2) failure to properly identify and document all related party transactions; (3) insufficient implementation of acquisition-related due diligence procedures; (4) insufficient credit control procedures; and (5) ineffective board of directors oversight of financial reporting and internal control.***
>
> ***Following the identification of these control deficiencies, SearchMedia undertook certain remedial steps to address certain deficiencies, including hiring additional accounting staff and training its new and existing accounting staff and conducting due diligence on companies with which it does business to identify related parties.*** SearchMedia is in the process of setting up an internal audit team to plan and implement Sarbanes-Oxley Act of 2002 related activities, and is hiring additional legal and compliance staff. SearchMedia plans to implement additional steps to address these identified control deficiencies and improve its internal control over financial reporting . . .

(Emphasis added).

115.    Even though Ideation and the Ideation Defendants were aware of and alerted to these internal control issues and represented that SMIL was taking certain remedial steps, many of the issues that had been identified were essentially the same internal control issues that resulted in the Restatement.   For example, the Company's FY 2009 Form 10-K indicates that in reaching the decision to restate SMIL's FY 2007 and FY 2008 financial results, the audit committee reviewed management's analysis of SMIL's practices relating to the following and noted that "[a]s a result of this analysis [the Company] identified an overstatement of approximately $45.7 million in SearchMedia International's previously reported revenue for the year ended December 31, 2008":

     o   Revenue recognition and accounts receivable;

     o   Disclosure, approval, and documentation of transactions among entities related to prior owners of acquired subsidiaries (which we refer to as Arelated entity transactions");

     o   Proper documentation of transactions;

     o   Recording of various erroneous transactions by certain employees;

- o   Recording of certain assets and other accounting irregularities related to acquisitions;

- o   Procedures related to diligence and approval of transactions; and

- o   Confirmation of payments related to acquisitions.

116.   Given the sophistication of the Ideation Defendants, their knowledge of the previously identified internal control problems, and the massive size of the revenue overstatement, the Ideation Defendants either knew of the accounting issues at SMIL or were deliberately reckless in not knowing by intentionally failing to thoroughly review the facts and circumstances behind the internal control deficiencies previously identified by SMIL's independent auditor.

### e.   One Acquired Subsidiary Was Not Actually Acquired By SMIL

117.   Shockingly, despite Ideation's due diligence, the Restatement revealed that "[i]n July 2008, [SMIL] signed an acquisition agreement to acquire Changsha Jingli which was primarily engaged in the provision of advertising services using poster frames that are placed inside elevators in residential and commercial buildings in Changsha city of the PRC." Nevertheless, the Restatement revealed that "[d]uring a financial review, an acquisition deposit of Changsha Jingli of $1,321,000, purportedly paid to a third party, could not be confirmed" and that "[t]he ex-owner of Changsha Jingli denied signing any contracts with the Company, bringing the acquisition of Changsha Jingli into doubt, as well as the legality and enforceability of the acquisition agreement."

### 4.   The Ideation Defendants' Financial Motivation to Proceed with the Merger

118.   The Ideation Defendants had a distinct financial motivation to ensure that stockholders approved the Merger by withholding any information about SMIL's accounting and internal control issues uncovered during due their diligence.   Ideation only had until November

19, 2009, to complete a transaction or it would automatically liquidate.   Given the significant time needed to prepare for any such transaction (*e.g.*, the Merger itself received the Board's approval on March 31, 2009, and the Company did not hold a shareholder vote until the end of October 2009), if the Merger with SMIL was terminated for any reason, Ideation lacked sufficient time to prepare and complete a shareholder approved transaction by November 19, 2009.

119.    If Ideation did not complete a business combination by November 19, 2009, and was required to liquidate, a total of 2,500,000 shares of common stock held by Ideation officers, directors and affiliates, which were acquired prior to Ideation's IPO (for an aggregate purchase price of $25,000) would become ***worthless***, as would 2,400,000 warrants that were acquired simultaneously with the Ideation IPO for an aggregate purchase price of $2,400,000.   These shares and warrants had an aggregate market value of approximately $23.7 million based on the last sale price of $7.86 and $1.70, respectively, on NYSE Amex on October 2, 2009, the record date for the vote.

120.    Furthermore, warrants to purchase Ideation common stock held by Ideation's officers and directors were exercisable upon consummation of the business combination.   Based upon the closing price of Ideation's common stock on October 2, 2009, the record date, of $7.86, if all warrants held by Ideation's officers and directors were exercised at the $6.00 per share exercise price, the value of such shares of common stock would be approximately $29.0 million.

121.    There were additional reasons why the Ideation Defendants were motivated to ensure that a business combination occurred and that Ideation did not liquidate.   Either revealing the truth about SMIL's financial condition or failing to complete a business transaction by November 19, 2009, would have exposed the Ideation Defendants to potential legal liabilities

and/or lawsuits.   Significantly, all rights specified in Ideation's Amended and Restated Certificate of Incorporation relating to the right of officers and directors to be indemnified by Ideation, and of Ideation's officers and directors to be exculpated from monetary liability with respect to prior acts or omissions, would continue only after a business combination.   Hence, if the Ideation Defendants revealed the truth about SMIL's accounting, which would certainly result in the Merger not being approved and Ideation being liquidated, Ideation would not have been able to perform its obligations to its officers and directors under those provisions, leaving the Ideation Defendants to face the fallout and liability stemming from their actions.

   **5.    The Ideation Were Already Facing Substantial Difficulty in Gaining Shareholder Approval and Could Not Afford to Disclose Anything Negative About SMIL**

   122.    The Ideation Defendants were desperately working to close the Merger before the November 19, 2009, deadline and already facing substantial difficulty in gaining support from Ideation's stockholders.   For example, a November 25, 2009, article from the *Daily Business Review* about the lawyers representing Ideation in the Merger notes that "[m]any investors, particularly hedge fund backers, were initially inclined to cash out instead of merge with SearchMedia."   The article, entitled, "Hardest part of Chinese deal was convincing stockholders in U.S.," notes that "[i]n the middle of an economic downturn, Ideation shareholders were worried about redirecting their stake in the company to another business."   The article highlights that due to the economic environment, the Ideation Defendants were already facing substantial opposition to the transaction. The article quotes one of Ideation's lawyers as saying that "'[a] lot of SPACs recently were not getting approval [for mergers] and just liquidating.'"

   123.    The article highlights the extensive length the Ideation Defendants went through to

ensure that stockholders voted in favor of the Merger. Due to their ongoing concerns about stockholders voting against the Merger to exercise conversion rights, Ideation took action to further amend its Amended and Restated Certificate of Incorporation to include something referred to as "universal conversion." Essentially, Ideation extended conversion rights upon completion of the Merger to holders of IPO Shares who vote either for or against the business combination.

124. Already faced with substantial opposition from stockholders, the difficulties of the economy encouraging investors to seek conversion, and the impending November 19, 2009, deadline, the Ideation Defendants could not afford to disclose anything negative about accounting issues or irregularities at SMIL or SMIL's true financial condition/valuation.

## C. **SearchMedia's Scienter**

### 1. **SearchMedia's Lack of Corporate Governance**

125. Following the Merger, SearchMedia demonstrated a clear lack of candor with disclosing not only the existence of the accounting issues at SMIL, but the full extent and size of the accounting issues. In particular, SearchMedia demonstrated a lack of governance in handling and disclosing the underlying issues related to SMIL. For example, during a conference call with investors, one participant expressed grave concern about the obvious lack of corporate governance at SearchMedia:

> [*Analyst*:]: I was reading a research note from Gilford Securities that Mr. Conway was an advisor on this deal, is that correct? So you advised this deal, it immediately blows up, the stock market is telling you that you've essentially lost 80-90%, that you overpaid 80-90% and you've been hired as the CEO. See this is the problem I have with the corporate governance here at the company is that the question was asked if Search Media has gone back to the advisors to see about some clawback or some compensation for the advice on this deal and it's kind of hard because that would be a matter of the CEO investigating himself when he was the

advisor.   Do you see the problems there?

[*Defendants Fried, Conway, and Rubin*:] . . . [No response]

[*Analyst*:] Does anyone want to answer that?

[*Defendant Rubin*:] First of all, Paul is not currently on the board and he's no longer with Oppenheimer, so I don't think with our relationship if thought it was appropriate to go against Oppenheimer we would meet any resistance.

[*Analyst*:] Who's going to lead the charge?   Is the CEO going to lead the charge against his former employer when he led the deal?   Is that who's going to lead the charge for Search Media if you go after them?

[*Defendant Rubin*:] Well, right now we're really focused on the prior shareholders of Search Media.   There was a fair amount of strong and vigorous diligence conducted.

[*Analyst*:] Not enough clearly.

[*Defendant Rubin*:] Well you can't discover everything in diligence as we all know from many experiences.   Most of the things we uncovered as a matter of fact was after our own management was in place and on the ground, and that was through the efforts of Paul and Wilford and their team.   That's when almost all of the issues that we're dealing with now were discovered.   So you can't discover everything and blame everything on a diligence process.   If people want to hide things, they can.   We're still going through this process.   The message we want to get across is we will deal with this appropriately and in the meantime, we're looking forward.

[*Analyst*:] Ok I'm on a go-forward basis.   Paul, have you ever run a business in China before?

[*Defendant Conway*:] No

[*Analyst*:] Do you speak Chinese Paul?

[*Defendant Conway*:] I'm learning.

[*Analyst*:] So the company hires someone who has never run a business in China before, who never speaks Chinese, to run this company.   Again, these are issues of corporate governance.   I wonder what's going on at the board level.   And then Wilfred coming from American Oriental which had a horrific reputation in terms of their finance department and what they did with shareholder's funds.   It's just one thing after another.   You buy a pig in a poke, you have a terrible deal, then you hire

69

the advisor that did that terrible deal, then for a CFO, you hire a CFO from a company that had a terrible track record for abusing shareholder's funds. I'm deeply concerned. I'm just sort of wondering what's going on at the board level.

[*Defendant Fried*:] Obviously you disagree with the choices. You obviously have that right to disagree. We believe Paul Conway is an excellent choice, and that Mr. Chow was an excellent choice. We didn't know it was a pig in a poke when Mr. Conway joined the company we did not know the extent of the receivables issues that we were addressing. We just knew that we had some operational issues. When he came in and Wilford came in, they did an excellent job extirpating those issues and immediately taking action to remedy them.

[*Analyst*:] What was Oppenheimer compensated for the advisory work when they advised the SPAC to do this deal?

[*Defendant Fried*:] I don't recall what their fee is. Perhaps someone else can answer that.

[*Defendant Conway*:] I believe it was approximately $2 million all in.

[*Analyst*:] Is there anyone in charge of the compensation committee. Is there a compensation committee?

[*Defendant Conway*:] Yes there is.

[*Analyst*:] Who's in charge.

[*Defendant Conway*:] The head of the compensation committee is Earl Yen ??

[*Analyst*:] ***I find it staggering to think that Paul should be awarded the number of shares he was awarded in February after having destroyed the company by advising on this deal and on a going forward basis if you keep making acquisitions like this the company is going to be out of business. I've seen some poor corporate governance, but this really takes the cake. Good luck.***

(Emphasis added).

## 2.   Formal SEC Investigation

126.   SearchMedia has disclosed that it is now the subject of a formal investigation by the

SEC regarding "the issues that are the subject of [its] restatement of financial results announced on

August 20, 2010."

## VII.   ADDITIONAL ALLEGATIONS OF
## LOSS CAUSATION AND ECONOMIC LOSS

127.    The market for SearchMedia securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or omissions, SearchMedia securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired SearchMedia securities relying upon the integrity of the market price of the Company's securities and market information relating to SearchMedia, and have been damaged thereby.

128.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of SearchMedia securities by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.   These false statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about SearchMedia's business, operations, and prospects as alleged herein.

129.    At all relevant times, Defendants' material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SearchMedia's financial performance and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus directly causing the Company's securities to be artificially inflated at all relevant times.

71

Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

130.    During the Class Period, Plaintiff and the Class purchased SearchMedia securities at artificially inflated prices and were damaged thereby.   The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**A.      The Price of Ideation's Securities Plummets, Causing Massive Losses to Investors**

131.    As the true facts about SMIL's business, operations, prospects, and value, became known, and/or materializations of concealed risk occurred, the artificial inflation was removed from the market prices of Ideation/SearchMedia securities, causing damage to Plaintiffs and members of the Class.

132.    Following the Company's announcement of its Q3 2009 financial results on December 23, 2009 – reporting that the Company's revenue from its in-elevator business was performing below the Company's expectations due to increased competition and the challenging ad market, as well as forecasted elevator revenue declines resulting from exiting less lucrative/profitable locations – SearchMedia's stock fell $0.55 per share, or nearly 6.5%, to close on December 23, 2009, at $7.95 per share, on unusually heavy trading volume.   SearchMedia's warrants declined $0.60 per warrant, or 20.69%, to close on December 23, 2009, at $2.30 per warrant.   Unbeknownst to investors at that time, the real reason for the weakness in the Company's elevator business in Q3 2009 and forecasted elevator revenue declines was related to

the Company's efforts to address the "operational and other issues" primarily related to Jingli, which had negatively impacted the Company's Q3 2009 financial results and would continue to impact the Company's quarterly elevator revenues going forward.

133.    Following SearchMedia's announcement of its Q3 2009 results, an analyst from Gilford Securities issued a report on December 28, 2009, that reduced its earnings estimates for the Company going forward for FY 2009 and FY 2010.   The reduction in earnings forecasts represented materializations of the risks related to, among others, Defendants false and misleading portrayal of SMIL's financial results, profitability, future prospects, revenue growth, and financial value.   On this news, shares of SearchMedia's common stock declined by $0.41 per share, or 5.16%, to close on December 28, 2009, at $7.54 per share, on unusually heavy volume, and further declined by $0.31 per share, or 4.11%, to close on December 29, 2009, at $7.23 per share, on usually heavy volume.

134.    On March 31, 2010, the Company announced that it was delaying the filing of its Annual Report on Form 10-K for the year ended December 31, 2009, and assessing the materiality of certain uncollectible accounts receivable related to sales generated primarily in the in-elevator business, which the Company indicated would likely result in significant adjustments from previously disclosed estimated financial results for 2009. On this news, SearchMedia's common stock fell $0.41 per share, or approximately 8.7%, to close on April 1, 2010, at $4.30 per share, on unusually heavy trading volume.   Similarly, SearchMedia's warrants declined $0.25 per warrant, or 25%, to close on April 1, 2010, at $0.75 per warrant.

135.    Days after SearchMedia issued preliminary financial results for FY 2009, on April 23, 2010, an analyst from Gilford Securities downgraded SearchMedia to "Sell" in a report that

expressed concern about "the possibility that there are other problems that [SearchMedia] has yet to uncover" and that questioned the credibility of current financial projections.  On this news, shares of SearchMedia's common stock declined $0.78 per share, or 12.85%, to close on April 23, 2010, at $5.29 per share, on usually heavy volume, and the price of SearchMedia's warrants declined $0.37 per share, or 30.83%, to close on April 23, 2010, at $0.83 per warrant.

136.    On August 20, 2010, SearchMedia announced that the historical financial statements of SMIL for the 2007 and 2008 fiscal years would have to be restated and that the financial statements from these periods could no longer be relied upon because SMIL's previously reported FY 2007 and FY 2008 revenue had been overstated. On this news, SearchMedia's common stock fell $0.78 per share, or nearly 23%, to close on August 20, 2010, at $2.62 per share, on unusually heavy trading volume, and further declined an additional $0.92 per share, more than 35%, to close on August 23, 2010, at $1.70 per share, again on unusually heavy trading volume. Over the course of these two days of trading, SearchMedia's common stock declined a combined $1.70 per share, or 50%, from the closing price of $3.40 per share on August 19, 2010.   Similarly, SearchMedia's warrants fell $0.22 per warrant, or nearly 41%, to close on August 20, 2010, at $0.32 per warrant.

**B.    Ideation Shareholders Would Not Have Approved the Merger and/or Exercised Conversion Rights**

137.    In addition to the decline in Ideation securities caused by the corrective disclosures alleged above, Ideation's shareholders who were eligible to vote on the Merger and/or exercise their conversion rights, have also been damaged as a result of the materially false and/or misleading statements about SMIL's operating results and financial value.   Had the true financial condition and value of SMIL been known, members of the Class eligible to vote on the Merger and

exercise their conversion rights, would have voted against the Merger and/or exercised their conversion rights and received $7.8815 in cash per share of Ideation stock.

138.    As a result, the Merger would not have been approved at the October 27, 2009, shareholder vote and more likely than not, there would have been insufficient time for Ideation to conduct another business transaction before November 19, 2009.   As such, Ideation would have commenced liquidation and Plaintiffs and other members of the Class that were holding Ideation stock would have received approximately $7.8815 in cash for each share of Ideation common stock held.   Instead, Plaintiffs and other members of the Class who would have received a pro rata distribution if Ideation liquidated, retained their common stock which precipitously declined in value as the true financial condition and valuation of SMIL slowly became known.

139.    It was foreseeable to Defendants that the false and/or misleading statements about, among others, SMIL's financial results, condition, and value: (i) would cause those members of the Class that would have received $7.8815 in cash per share of Ideation stock upon exercising conversion rights and/or upon liquidation, to keep their stock in lieu of receiving $7.8815 in cash per share; and (ii) eventually the disclosure of the information about SMIL's financial condition and value would cause those members of the Class to instead receive either substantially less for each share sold after November 19, 2009, or the value of those shares of stock still held to be worth substantially less than $7.8815 per share.   As a result, the conduct of Defendants directly and proximately caused foreseeable losses to those Plaintiffs and members of the Class.

## C.    Ideation's Failure to Consummate a Qualifying Business Transaction and Failure to Properly Distribute the IPO Proceeds From the Trust Account

140.    In addition, Ideation's shareholders who were eligible to vote on the Merger have also been damaged on account of Ideation's failure to consummate a qualifying business

combination within the required two-year time frame and Ideation's improper distribution and use of the IPO funds in the trust account.

141.    Pursuant to Ideation's Amended and Restated Certificate of Incorporation, the target business that Ideation acquired or merged with had to have a fair market value equal to at least 80% of Ideation's net assets (excluding deferred underwriting discounts and commissions of $2.73 million) at the time of such acquisition/merger, determined by the Ideation Board based on standards generally accepted by the financial community, such as actual and potential sales, earnings, cash flow and book value.   Further, under Ideation's amended and restated certificate of incorporation, Ideation would continue in existence only until November 19, 2009, at which date, if Ideation had not yet completed a business combination, its corporate existence would cease, except for the purposes of winding up its affairs and liquidating.   As such, Ideation was required to hold the approximately $78.8 million from its IPO in a trust account, which were not to be released until the earlier of the consummation of a business combination or liquidation of Ideation.

142.    It was foreseeable that the false and/or misleading statements about SMIL's financial condition would cause losses to those Plaintiffs and members of the Class who were eligible to vote on the Merger because had the true financial condition/value of SMIL been known, SMIL's fair market value would have been less than 80% of Ideation's net assets at the time of the Merger.   As such, Ideation failed to make an acquisition by November 19, 2009, that met the 80% Requirement imposed by Ideation's Amended and Restated Certificate of Incorporation, and thus, Ideation improperly removed the $78.8 million from its IPO in a trust account, which were not to be released until the earlier of the consummation of a business combination or liquidation after November 19, 2009.   As such, all Plaintiffs and Class Members who held Ideation common stock

on the record date for the vote on the Merger and were eligible to vote thereon, are entitled to the return of their pro rata distribution of the $78.8 million from its IPO.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

143.    The market for SearchMedia securities was open, well-developed and efficient at all relevant times.   As a result of the materially false and/or misleading statements and/or failures to disclose, SearchMedia securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of SearchMedia securities and market information relating to SearchMedia, and have been damaged thereby.

144.    During the Class Period, the artificial inflation of SearchMedia securities was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.   As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SearchMedia and SMIL's financial performance and prospects. These material misstatements and/or omissions created an unrealistically positive assessment of SearchMedia and SMIL's business, operations, and financial performance, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's securities.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

145.    At all relevant times, the market for SearchMedia securities was an efficient market

for the following reasons because:

        a.      SearchMedia securities met the requirements for listing, and was listed and actively traded on the AMEX, a highly efficient and automated market;

        b.      As a regulated issuer, SearchMedia filed periodic public reports with the SEC and the AMEX;

        c.      SearchMedia regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

        d.      SearchMedia was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

146.   As a result of the foregoing, the market for SearchMedia securities promptly digested current information regarding SearchMedia from all publicly available sources and reflected such information in SearchMedia's stock price. Under these circumstances, all purchasers of SearchMedia securities during the Class Period suffered similar injury through their purchase of SearchMedia securities at artificially inflated prices and a presumption of reliance applies.

## IX.   NO SAFE HARBOR

147.   The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SearchMedia who knew that the statement was false when made.

## X.   FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

148.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

149.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase SearchMedia securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

150.     Defendants (i) employed devices, schemes, and artifices to defraud;  (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SearchMedia securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

151.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SearchMedia's financial well-being and prospects, as specified herein.

152.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Ideation, SMIL, and SearchMedia's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Ideation, SMIL, and/or SearchMedia and their business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

153.     Each of the Individual Defendants' primary liability, and controlling  person

liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at Ideation, SMIL, and/or SearchMedia during the Class Period and members of the Ideation, SMIL, and/or SearchMedia management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of Ideation, SMIL, and/or SearchMedia, was privy to and participated in the creation, development and reporting of Ideation, SMIL, and/or SearchMedia's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of Ideation, SMIL, and/or SearchMedia's management team, internal reports and other data and information about the Ideation, SMIL, and/or SearchMedia's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Ideation, SMIL, and/or SearchMedia's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

154.    The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Ideation, SMIL, and/or SearchMedia's financial well-being and prospects from the investing public and supporting the artificially inflated price of SearchMedia's securities. As demonstrated by Ideation, SMIL, and/or SearchMedia's overstatements and/or misstatements of the Ideation, SMIL, and/or SearchMedia's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they

did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

155. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of SearchMedia securities was artificially inflated during the Class Period.   In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired SearchMedia securities during the Class Period at artificially high prices and were damaged thereby.

156. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.   Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the Ideation, SMIL, and/or SearchMedia's improper accounting practices, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their SearchMedia securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

157. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

158.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## XI.   SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

159.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

160.    The Individual Defendants acted as controlling persons of SearchMedia and/or SMIL within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Ideation, SMIL, and/or SearchMedia's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and/or disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Ideation, SMIL, and/or SearchMedia, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.   The Individual Defendants were provided with or had unlimited access to copies of Ideation, SMIL, and/or SearchMedia's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

161.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of Ideation, SMIL, and/or SearchMedia and, therefore, is presumed to

have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

162.    As set forth above, Ideation, SMIL, SearchMedia and the Individual Defendants each violated either Section 10(b) and Rule 10b-5, by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants= wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**XII.   THIRD CLAIM**
**Violation of Section 14(a) of The Exchange Act**
**and Rule 14a-9 Promulgated Thereunder Against**
**Defendant SearchMedia, SMIL, the Ideation Defendants, and the SMIL Defendants**

163.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

164.    The claims set forth herein do not sound in fraud and are based on negligent conduct by the defendants named herein.

165.    The defendants named herein violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these defendants solicited proxies from Plaintiffs and other members of the Class by means of a Proxy Statement that through defendants' negligence contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

166.    Plaintiffs and other members of the Class were misled by defendants' false and misleading statements and omissions, were denied the opportunity to make an informed decision

in voting on the Merger, and approved the Merger without having been advised of material facts. Accordingly, Plaintiffs and other members of the Class did not receive their fair share of the value of the assets and business of the combined entity, suffered the dilution of their individual holdings of Ideation stock, suffered damages when the Company's stock price decreased, and were prevented from benefitting from a value-maximizing transaction.

### XIII.   FOURTH CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

167.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

168.    The Ideation Defendants acted as controlling persons of Ideation as within the meaning of Section 20(a) of the Exchange Act as alleged herein and the SMIL Defendants acted as controlling persons of SMIL a within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, these defendants had the power and authority to cause Ideation or SMIL to engage in the wrongful conduct complained of herein. These defendants were able to, and did, control directly and indirectly, the content of the Proxy/Prospectus and the other solicitations described herein made by Ideation or SMIL, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

169.    In particular, the Ideation Board participated in Board meetings and conference calls, reviewed the Merger Agreement and voted to approve the Merger, signed the Proxy/Prospectus and solicited the approval of the Merger through the Board's recommendation to

vote in favor of the Merger, which appeared in the Proxy/Prospectus.   In particular, the SMIL Defendants reviewed the Merger Agreement, reviewed and furnished information for inclusion in the Proxy/Prospectus, and solicited the approval of the Merger.

170.   As set forth above, in their capacities as officers and/or directors of Ideation or SMIL, these defendants participated in the misstatements and omissions set forth above.   Indeed, each of these defendants had access to information regarding the circumstances surrounding the Merger and SMIL, including the terms of the Merger, analysis of SMIL's operating results and financial condition, the valuation of SMIL, and the due diligence that had and had not been performed.   As a result, these defendants were individually and collectively control persons within the meaning of Section 20(a) of the Exchange Act.

171.   As set forth above, Ideation and SMIL violated Section 14(a) of the Exchange Act by their acts and omissions as alleged above.   By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.   The Ideation Board and SMIL Defendants were culpable participants in the violations of Section 14(a) alleged herein because they failed to make a reasonable investigation and did not possess reasonable grounds for the belief that the statements contained in Ideation and SMIL's proxy solicitations issued were true and free of any omissions of material fact.   As detailed above, during the respective times that these defendants served as officers and/or directors of Ideation and SMIL, each is responsible for the material misstatements and omissions made by Ideation and SMIL.

172.   Plaintiffs and Class members eligible to vote on the Merger were denied the opportunity to make an informed decision in voting on the Merger and were damaged as a direct and proximate cause of the untrue statements and omissions in the Proxy/Prospectus and other

solicitations described herein.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XV.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: April 11, 2011          **SAXENA WHITE P.A.**

By: */s/ Joseph E. White, III*
Joseph E. White III (Florida Bar # 0621064)
Lester R. Hooker (Florida Bar # 0032242)
Brandon T. Grzandziel (Florida Bar # 0058732)
2424 N. Federal Highway, Suite 257
Boca Raton, Florida 33431
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Peter A. Binkow
Robert V. Prongay
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150

87

Facsimile: (310) 201-9160

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
275 Madison Avenue, 34th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827

***Attorneys for Plaintiffs***

## SWORN CERTIFICATION OF PLAINTIFF

SearchMedia Holdings Limited, **SECURITIES LITIGATION**

I, Joel Johanneson, certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase SearchMedia Holdings Limited, the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in SearchMedia Holdings Limited, Inc. during the class period set forth in the Complaint are as follows:

   I bought 1000 shares on 01/11/10 at $7.15 per share.
   I bought 1000 shares on 01/12/10 at $7.10 per share.
   I bought 1000 shares on 01/12/10 at $7.09 per share.
   I bought 1000 shares on 01/27/10 at $6.28 per share.

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

Dated: 10/6/10

Joel Johanneson

**SWORN CERTIFICATION OF PLAINTIFF**

SearchMedia Holdings Limited, **SECURITIES LITIGATION**

I, Wallace Sapp, certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase SearchMedia Holdings Limited, the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in SearchMedia Holdings Limited, Inc. during the class period set forth in the Complaint are as follows:

   I bought __300__ shares on _03_/_09_/_2010_ at $_5.499_ per share.
   I bought _____ shares on ___/___/___ at $____ per share.
   I bought _____ shares on ___/___/___ at $____ per share.
   I bought _____ shares on ___/___/___ at $____ per share.
   I bought _____ shares on ___/___/___ at $____ per share.

   I sold _____ shares on ___/___/___ at $____ per share.
   I sold _____ shares on ___/___/___ at $____ per share.
   I sold _____ shares on ___/___/___ at $____ per share.
   I sold _____ shares on ___/___/___ at $____ per share.
   I sold _____ shares on ___/___/___ at $____ per share.

   (List Additional Transactions on a Separate Page if Necessary)

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

   ____ ☐ Check here if you are a current employee or former employee of the defendant Company.

   I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: 8·30·2010                    _Wallace Sapp_
                                    (Please Sign Your Name Above)

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 11, 2011, I presented the foregoing to the Clerk of

the Court for filing and uploading to the CM/ECF system.

<u>*/s/ Joseph E. White, III*</u>
Joseph E. White, III