UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 11-Civ-20549-Ungaro

_____

SID MURDESHWAR, et al.,

     Plaintiffs,

v.

SEARCH MEDIA HOLDINGS
LTD, et al.,

     Defendants

_____

## <u>ORDER ON MOTION TO DISMISS</u>

THIS CAUSE is before the Court upon Defendants SearchMedia Holdings Limited, Phillip Frost, Robert Fried, Rao Uppaluri, Steven Rubin, Glenn Halpryn, Thomas Beier, David Moskowitz and Shawn Gold's Motion to Dismiss Amended Complaint, filed May 2, 2011 (D.E. 47). Plaintiffs responded in opposition to the Motion to Dismiss on May 19, 2011 (D.E. 49). The Defendants replied on May 31, 2011 (D.E. 52). The Motion is fully briefed and ripe for disposition.

THE COURT has considered the Motion, the pertinent portions of the record, and is otherwise fully advised in the premises.

Background

This is a securities fraud class action brought against SearchMedia Holdings Limited ("SearchMedia"), formerly Ideation Acquisition Corp. ("Ideation"), and officers and directors of both SearchMedia and SearchMedia International Limited ("SMIL"). The lawsuit arises out of a merger between Ideation and SMIL (the "Merger"). Plaintiffs assert claims under the Securities

Exchange Act of 1934 (the "Exchange Act"), Sections 10(b), 14(a) and 20(a), alleging that Defendants knew, or were reckless in not knowing, that proxy statements and certain other statements made to the investing public regarding SMIL and the Merger omitted material facts and contained material misrepresentations.

This action was originally filed on September 13, 2010 in the United States District Court of the Central District of California.  (D.E. 1).  It was then transferred to this Court on February 17, 2011 (D.E. 34).  The Amended Complaint (the "Complaint") was filed on April 11, 2011. (D.E. 45, "Compl.").  As of the date of this Order, Plaintiffs have failed to effectuate service upon foreign Defendants SearchMedia International Limited, Garbo Lee, Paul Conway, Qinying Liu, Earl Yen and Jennifer Huang.  A motion to extend the time to serve these Defendants is pending before the Court.  (D.E. 62).  The instant Motion to Dismiss is brought by all of the Defendants served in the case.

## Background

### I.    The Parties[1]

Lead Plaintiff Noel Upfall,[2]  along with Plaintiffs Cattolica Partecipazioni S.p.A. ("Partecipazioni"), Sid Murdeshwar, Joel Johanneson, Wallace Sapp, Hymie Akst and Mehmet

---

[1] For purposes of the Motion to Dismiss, the Court takes the facts alleged in the Complaint as true.  *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994). Accordingly, the Court will largely dispense with the use of "allegedly" in its recitation of the facts underlying the claims.

[2] On December 19, 2010, the Central District of California Court appointed Partecipazioni and Noel Upfall Co-Lead Plaintiffs.  (D.E. 23.)  The Amended Complaint designates only Cattolica Partecipazonia S.p.A., an institutional investor which claims losses of $2,463,876.70, as the Lead Plaintiff.  (D.E. 45.)  On July 26, 2011, Plaintiffs Partecipazioni and Upfall moved to withdraw Plaintiff Partecipazioni and substitute Plaintiff Upfall as the sole Lead Plaintiff.  (D.E. 57.)  The Court granted that Motion.  (D.E. 65.)

Canga (collectively, "Plaintiffs"), bring these claims on behalf of a putative class of two subclasses of persons: (1) those who purchased Ideation or SearchMedia securities between April 1, 2009 and August 20, 2010; and (2) those who held common stock in Ideation on October 2, 2009 and were eligible to vote at a October 27, 2009 shareholder meeting at which the Merger was approved.  (Compl. ¶ 1.)

Defendant SearchMedia is the company formed as a result of the Merger between Ideation and SMIL.  (*Id.* at ¶ 9.)  Ideation was a special purpose acquisition company ("SPAC") that was formed to acquire or merge with one or more businesses. (Compl. n.1.)  Defendant SMIL is a Chinese media company that was acquired by Ideation in the Merger.  After its merger with SMIL, Ideation changed its name to SearchMedia and SMIL became a wholly owned subsidiary of SearchMedia.  (*Id.* at ¶¶ 5, 9, 26.)

The remaining Defendants are individuals who were directors or officers of Ideation, SMIL and/or SearchMedia.  (*See* Compl. ¶¶ 27-42.)  Specifically, the following Defendants held positions with Ideation pre-Merger (the "Ideation Defendants"):

a.   Defendant Robert Fried served as the Chief Executive Officer ("CEO") and as a Director of Ideation (Compl. ¶ 27);

b.   Defendant Phillip Frost served as the Chairman of the Board of Directors (the "Board") of Ideation (*id.* at  ¶ 28);

c.   Defendant Rao Uppaluri served as the Treasurer, Director and as the principal financial and accounting officer of Ideation (*id.* at ¶ 29);

d.   Defendant Steven D. Rubin served as the Secretary of Ideation (*id.* at ¶ 30);

e.   Defendant Glenn Halpryn served as a Director of Ideation and as a member of the

Ideation Audit Committee (the "Audit Committee") (*id.* at ¶ 31);

    f.   Defendant Thomas Beier served as a Director of Ideation and as a member of the Audit Committee (*id.* at ¶ 32);

    g.   Defendant David H. Moskowitz served as a Director of Ideation and as a member of the Audit Committee (*id.* at ¶ 33); and

    h.   Defendant Shawn Gold served as a Director of Ideation and as a member of the Audit Committee (*id.* at ¶ 34).

The following Defendants held positions with SMIL pre-Merger (the "SMIL Defendants"):

    a.   Defendant Garbo Lee served as President of SMIL (Compl. ¶ 36);

    b.   Defendant Qinying Liu served as Chairman of the Board of SMIL (*id.* at ¶ 37);

    c.   Defendant Earl Yen served as Vice Chairman of the Board of SMIL (*id.* at ¶ 38); and

    d.   Defendant Jennifer Huang served at various times as Chief Operating Office ("COO"), Chief Financial Officer ("CFO") and as "Acting CFO" of SMIL (*id.* at ¶ 39).

Three of the Ideation Defendants and three of the SMIL Defendants assumed leadership positions in the new SearchMedia[3]:

    a.   Defendant Fried served as Co-Chairman of the Board of SearchMedia (Compl. ¶ 27);

    b.   Defendant Rubin served as a Director of SearchMedia (*id.* at ¶ 30);

---

[3] Defendants Frost, Uppaluri, Beier, Gold and Moskowitz are not alleged to have held any position with SearchMedia, post-Merger.

    c.    Defendant Halpryn served as Director of SearchMedia[4] (*id.* ¶ 31);

    d.    Defendant Lee served as President of SearchMedia (*id.* ¶ 36);

    e.    Defendant Liu served as Co-Chairman of the Board of SearchMedia (*id.* at ¶ 37);

    f.    Defendant  Yen served as Director of SearchMedia (*id.* at ¶ 38);

    g.    Defendant Huang served as COO of SearchMedia (*id.* at ¶ 39); and

    h.    Defendant Paul Conway ("Conway"), starting in February of 2010, served as CEO of
SearchMedia (*id.* at ¶ 41)

(the "SearchMedia Defendants" and together with the Ideation Defendants and SMIL

Defendants, the "Individual Defendants").


## II.  The Allegations

### A.  The Formation of Ideation

On June 1, 2007, Defendants Frost, Uppaluri, Rubin, Halpryn, Beier, Moskowitz and

Gold formed Ideation as a SPAC, also known as a "blank check" company.  (Compl.  ¶ 4.)

Ideation's purpose was to pursue and acquire businesses, through merger, stock exchange, asset

acquisition or other combination.  (*Id.* at  ¶ 2.)  Pursuant to its certificate of incorporation,

Ideation's scope was limited in three primary respects: (1) it could only acquire businesses with

fair market values that equaled at least 80% of its net assets at the time of the acquisition/merger;

(2) it only had twenty-four months from the date of Ideation's formation to consummate an

---

[4] Plaintiffs allege that Defendant Halpryn was "slated" to serve in a position with
SearchMedia, but never allege that he actually assumed any position with the company.
Plaintiffs concede in their Response, however, that Defendant Halpryn served as an outside
director of SearchMedia.  (D.E. 47 at 25.)  For purposes of deciding the Motion, the Court will
accept that Defendant Halpryn served as an outside director of SearchMedia post-Merger.

acquisition; and (3) any acquisition had to be approved by a majority of Ideation's stockholders. Accordingly, Ideation had until November 19, 2009 to identify an appropriate target company, obtain stockholder approval and complete a merger.  (*Id.* at ¶ 3.)

In connection with the formation of Ideation, on June 12, 2007, Defendants Frost, Uppaluri, Rubin, Halpryn, Beier, Moskowitz and Gold issued themselves 2,500,000 shares of Ideation common stock for $0.01 per share for a total of $25,000.  (Compl.  ¶ 4.)  In addition, they purchased warrants exercisable at $1.00 per warrant for 2,400,000 shares of Ideation common stock.  (*Id.*)  These initial stockholders agreed to waive their right to participate in any liquidation distribution with respect to their initial shares if Ideation did not perform its duties by the November 19, 2009 deadline.  (*Id.*)

In November 2007, Ideation completed an initial public offering ("IPO").  (Compl. ¶ 2.)  The IPO raised approximately $80 million by selling 10,000,000 units at $8.00 per unit.  (*Id.*)

**B. The Merger**

On April 1, 2009, Ideation announced that it had signed an agreement to acquire SMIL.  (Compl.  ¶ 5.)  SMIL was a Chinese media company that operated outdoor billboard and in-elevator advertising networks.  (*Id.*)  Six months later, on October 27, 2009, the Ideation stockholders "overwhelmingly approved" the Merger at a special meeting, and on October 30, 2009, the transaction was consummated.  (*Id.* at ¶ 9.)  Pursuant to the agreement and plan of merger, conversion and share exchange ("Share Exchange Agreement"), SMIL stockholders exchanged all of the outstanding shares of SMIL for 8,578,21 shares in the new combined company, SearchMedia.  (*Id.* at ¶ 5.)  As a result, SMIL stock holders owned 44% of SearchMedia.  (*Id.*)  Based on a conversion value of $7.8815 per share of Ideation stock, the

equity value of the Merger was approximately $176.7 million.  (*Id.*)

In the months leading up to the Merger and in those that followed, Defendants made various statements to investors regarding SMIL and the value of the Merger, including statements in filings with the Securities and Exchange Commission ("SEC").  Plaintiffs complain that these statements misrepresented SMIL's present and historical financial condition and mislead investors.  Pre-Merger, Ideation and SMIL represented that SMIL had revenues of $7.8 million in 2007 and $88.6 million in 2008.  (Compl. ¶ 55.) Post-Merger, on August 20, 2010, SearchMedia estimated that these revenues had been overstated by $6 million and $25 million, respectively, and that SMIL's financial statements for the fiscal years 2007 and 2008 would have to be restated.  (*Id.* at ¶ 80.)  Plaintiffs claim they have been damaged by their reliance on these and other of Defendants' statements.  (*Id.* at ¶ 129.)

The pre-Merger statements and the post-Merger statements are summarized below.

### C. The Pre-Merger Statements

#### 1. April 2009 Statement

Ideation announced the Merger in an April 1, 2009 Press Release (the "April 2009 Statement").  (Compl. ¶ 53.)  The April 2009 Statement described SMIL as "one of the largest integrated operators of outdoor billboard and in-elevator advertising networks in China" and stated that "[SMIL] ranked first in market share of in-elevator advertising displays in 13 out of the 26 most affluent cities in China and ranked second in an additional nine of these cities, according to a leading international research company in China."  (*Id.*)  That press release also included Defendant Frost's representation that SMIL had "built a strong market position in China's fast-growing outdoor advertising market" and Defendant Fried's statement that Ideation

was "confident of continued expansion [by SMIL] of their well established position in the marketplace." (*Id.*)

### 2. May 2009 Conference Statements

Shortly after the April 2009 Statement, on May 20, 2009, Defendants Fried, Lee, Lin and Yen attended a securities research conference in San Francisco, California during which Fried and Yen discussed the plans for the Merger (collectively, the "May 2009 Conference Statements"). (Compl. ¶ 54.) Fried stated that, based on "guidance for 2009" of "$123 million in sales, $50 million of EBIT,[5] and $30 million of net income" in 2009, Ideation would be issuing ten-million shares to SMIL's existing shareholders at a value of $7.88 a share "as the initial consideration for the transaction." (*Id.*) At this conference, Yen presented slides which he claimed demonstrated SMIL's "exceptional growth over the past three years. (*Id.*) Yen represented that in 2008 alone the company had "generated over $80 million of revenues and over $30 million of EBITDA."[6] (*Id.*) Yen also shared his belief that SMIL would see continued growth in 2009 despite the weak global economy. (*Id.*)

### 3. July 2009 Form 8-K

On July 16, 2009, Ideation filed a Current Report with the Securities and Exchange Commission (the "SEC") on Form 8-K (the "July 2009 Form 8-K"). (Compl. ¶ 55.) Ideation attached to this filing a presentation that Ideation and SMIL planned to use in meetings with investors. (*Id.*) The presentation contained slides listing SMIL's net revenue for 2007 and 2008

---

[5] "EBIT" is an abbreviation of earnings before interest and taxes.

[6] "EBITDA" is an abbreviation of earnings before interest, taxes, depreciation and amortization.

8

as $7.8 million and $88.6 million, respectively, and SMIL's net income for 2007 and 2008 as

$1.6 million and $15.6 million respectively.  (*Id.*)

### 4.  Proxy Statement Drafts and 2009 Proxy Statement

On July 15, 2009, September 10, 2009, September 23, 2009 and September 30, 2009

Ideation filed with the SEC versions of a "Proxy /Prospectus" for the Merger (the "Proxy

Statement Drafts").  (Compl. ¶ 58.)  The Proxy Statement Drafts represented that SMIL had

generated revenues of $7.8 million and $88.6 million in 2007 and 2008, respectively.  (*Id.*).  Each

of the drafts was signed by each of the Ideation Defendants.  (*Id.*)

On October 5, 2009, Ideation filed a final "Proxy/Prospectus" with the SEC (the "2009

Proxy Statement").  (Compl. ¶ 59.)  The 2009 Proxy Statement substantially repeated the

statements contained in the Proxy Statement Drafts and additionally stated that "SearchMedia's

revenues, operating income and net income were $7.8 million, $2.2 million and $1.2 million,

respectively, for the period from its inception on February 9, 2007 to December 31, 2007, or the

2007 period, and $88.6 million, $22.8 million and $4.3 million, respectively, for the year ended

December 31, 2008."  (*Id.* at ¶ 58.)  It also stated that "the Ideation board of directors believe[d]

that SearchMedia's business [would] continue to demonstrate an attractive financial profile" and

"[a]lthough financial projections are inherently uncertain, the Ideation board of directors

believed, and continue[d] to believe, the projections for SearchMedia's business [were] reliable,

based on Ideation's extensive due diligence."  (*Id.* at ¶ 59.)

In addition to these representations, the 2009 Proxy Statement disclosed certain risks and

warnings regarding SMIL's operations.  First, it set forth material weakness in SMIL's "internal

controls," which had been identified by an independent auditor.  (Compl. ¶ 60.)  The 2009 Proxy

Statement went on to highlight remedial actions taken by SMIL to address these deficiencies. (*See id.*)

The 2009 Proxy Statement also included a description of Ideation's due diligence efforts with respect to the Merger, representing that "[f]rom November 2008 through February 2009" Ideation and its legal advisors conducted due diligence on "Search Media's operations, financials, management team, and China outdoor advertising industry." (Compl. ¶ 100.) The 2009 Proxy Statement disclosed meetings between Ideation's and SMIL's board members and that, on March 27, 2009, Ideation had hired BDO China Shu Lun Pan Certified Public Accountants ("BDO") "to conduct a management and internal controls review on the audited/unaudited financial statements of the largest subsidiaries of SearchMedia . . . ." (*Id.*)

Finally, the 2009 Proxy Statement included a representation by the Ideation Board that the fair market value of SMIL was at least 80% of Ideation's net assets as required by Ideation's Certificate of Incorporation. (Compl. ¶ 61.) The Ideation Board asserted that it was qualified to make this value determination based on the "financial skills and background of several of its members." (*Id.*)

### 5. October 2009 Conference Statements

On October 13, 2009, Defendants Fried, Yen and Lee attended the "ROTH China Conference" in Miami Beach, Florida, at which they made certain statements regarding the SMIL and the Merger (collectively, the "October 2009 Conference Statements" and together with the April 2009 Statement, May 2009 Conference Statements, July 2009 Form 8-K, Proxy Statement

Drafts and 2009 Proxy Statement, the "Pre-Merger Statements")[7].  (Compl. ¶ 56.) At this conference, Defendant Fried represented that Ideation had performed due diligence with regards to SMIL and concluded that SMIL was "a company performing exceptionally well making great money, terrific cash flow, great revenue growth, but [which] owed some cash."  (*Id.*) Defendant Fried further assured the audience that Ideation had "also had an audit completed by KPMG so these numbers are all U.S. GAAP KPMG audited numbers and [Ideation] spent a full year . . . working with the company and doing diligence."  (*Id.*)

For his part, Yen spoke about the strength of SMIL's operations and stated that SMIL hoped to achieve about 16% revenue growth in 2009 though that number might be "slightly overstated" due to the fact that SMIL was doing acquisitions throughout 2008.  (Compl. ¶ 56.)

### D.  The Post-Merger Statements

#### 1.  November 2009 Form 8-K

Just after the Merger, on November 5, 2009, SearchMedia filed with the SEC a Current Report on Form 8-K, signed on behalf of SearchMedia by Defendants Liu, Yen, Lee and Huang (the "November 2009 Form 8-K").  (Compl. ¶ 68.) The November 2009 Form 8-K asserted that SMIL's revenues had "increased from $31.3 million for the six-month period ended June 30, 2008 to $44.9 million for six-month period ended June 30, 2009."  (*Id.*)

#### 2.  December 2009 Statement

On December 23, 2009, SearchMedia issued a press release announcing its third quarter 2009 earnings and acknowledging a downturn in revenues ("the "December 2009 Statement").

---

[7] Plaintiffs allege an additional post-Merger statement, a November 2, 2009 press release announcing the consummation of the Merger, but does not attribute to it any false or misleading statements.  (*See* Compl. ¶ 67.)

(Compl. ¶ 70.)  The December 2009 Statement disclosed that SMIL experienced a "slight sequential decrease" in total revenue and cost of revenue in the third quarter of 2009 from the second quarter of 2009 and the third quarter of 2008, primarily "due to a decline in the elevator business."  (*Id.*)  Defendant Lee was quoted as citing "increased competition and the challenging ad market" as the challenges confronting the in-elevator aspect of SMIL's business.  (*Id.*)  Lee stated that the SearchMedia was addressing these challenges by "focusing on higher-quality locations and [terminating] many of the underperforming elevator sites in our network, resulting in a smaller but . . . superior elevator network."  (*Id.*)  Lee anticipated that "revenue in the fourth quarter of 2009 will be down sequentially, primarily due to the rationalization of our in-elevator business."  (*Id.*)

On the day of the December 2009 Statement, SearchMedia's stock fell 6.5% to close at $7.95 per share and its warrants declined 20.69%.  (Compl. ¶ 132.)

### 3.  March 2010 Statement

On March 31, 2010, SearchMedia announced in a press release that the previously disclosed estimates of SMIL's 2009 financial performance were likely misstated (the "March 2010 Release").  (Compl. ¶ 73.)  Specifically, the March 2010 Release disclosed that SearchMedia's 2009 financial results would be delayed because SearchMedia had to assess "the materiality of certain uncollectible accounts receivable related to sales generated primarily in the in-elevator business, which the Company believes will likely result in "significant adjustments from previously disclosed estimated financial results for 2009."  (*Id.*) The March 2010 Statement further disclosed that Searchmedia "ha[d] begun discussions with several of the original SearchMedia shareholders to address the appropriate remedies . . . ."  (*Id.*)

12

Defendant Conway was quoted in the March 2010 Statement describing the "situation" as "disappointing," but representing that SearchMedia's management "ha[d] quickly and significantly enhanced [SearchMedia's] internal controls and processes" to address it. (Compl. ¶ 73.)

The day after the release, SearchMedia's stock fell 8.7%, to close at $4.30 on April 1, 2010. (Compl. ¶ 74.)

### 4. April 2010 Statement

On April 16, 2010, SearchMedia released a statement regarding its financial results for the full year 2009, making clear that SMIL was not as profitable as had been portrayed in the Pre-Merger Representations (the "April 2010 Statement"). (Compl. ¶ 76.) In the April 2010 Statement, Defendant Fried disclosed that, "[f]ollowing [the Merger], we discovered operational and other issues primarily relating to the Shanghai Jingli Advertising Company Limited ("Jingli")[8] in-elevator division of the Company." (*Id.*) Due to these findings, Defendant Fried stated that SearchMedia "may reverse approximately $16 to $18 million of revenues previously reported for the first nine months of 2009." (*Id.*) Thus, for the full year 2009, SearchMedia anticipated "$64 to $66 million" in revenue and a net loss of "approximately $6 to $8 million." (*Id.*)

The April 2010 Statement also revealed that SearchMedia had undertaken an investigation regarding allegations of fraud within SMIL. (Compl. ¶ 76.) The release disclosed that SearchMedia had received "anonymous letters claiming that fraudulent activities were

---

[8] Jingli is an in-elevator advertising division of the company.

occurring in the operations in China" and, in response, formed a special committee of the board

of directors and engaged independent counsel and forensic accountants to conduct an

investigation.  (*Id.*)  The April 2010 Release went on to list "operational improvements" made

during the first quarter of 2010.  (*Id.*)  Defendant Conway represented that SearchMedia had

taken steps to "dramatically tighten internal controls," "vigorously pursue the collection of

receivables," and "pursue all legal remedies available to the Company."  (*Id.*)

On that same day, April 16, 2010, Defendant Conway advised investors in a conference

call that SearchMedia had "contacted the sellers of [SMIL] to Ideation and notified them that the

financial projections for 2009 provided to [Ideation] and to other investors as of late October

2009 were wrong" (the "April 2010 Conway Statement").  (Compl. ¶ 57.)

### 5. May 2010 Statement

On May 24, 2010, SearchMedia released additional information regarding its financial

condition (the "May 2010 Statement," and together with the November 2009 Form 8-K,

December 2009 Statement, March 2010 Statement and April 2010 Statement, the "Post-Merger

Statements").  (Compl. ¶ 78.)  Wilfred Chow, the then CFO of SearchMedia, stated that

SearchMedia had experienced positive net income for the first quarter of 2010 despite that

quarter being, traditionally, the slowest quarter of the year.  (*Id.*)  Defendant Conway stated that

SearchMedia "[remained] confident in [their] ability to achieve revenue of approximately $85

million and net income of approximately $18 million for the full year 2010."  (*Id.*)  For the 2010

first quarter, SearchMedia anticipated "$13 million in revenue and approximately $1 million in

net income."  (*Id.*)

### 6.  The Restatement of SearchMedia's Financial Statements

14

On August 20, 2010, SearchMedia announced in a press release that it would be restating SMIL's historical financial statements for the fiscal years 2008 and 2009 (the "August 2010 Release").  (Compl. ¶ 80.)  The company revealed that they estimated "that revenue in 2007 and 2008 was overstated by approximately $6 million and $25 million, respectively."  (*Id.*)  After this announcement, SearchMedia's common stock fell 50%, within two days of trading, to close at $1.70 per share on August 23, 2010.  (*Id.* at ¶ 81.)

A year after the Merger, on November 1, 2010, SearchMedia filed its Annual Report on Form 10-K with the SEC for fiscal year 2009 (the "10-K").  (Compl.  ¶ 90.)  The 10-K revealed that SMIL's revenues had been significantly overstated due to accounting irregularities, including a "number of fictitious or questionable contracts" and "[a]pparent fictitious business transactions, forged contracts, and monitoring reports."  (*Id.* at ¶ 71.)  These irregularities included revenues in 2007 that were overstated by $6 million and revenues in 2008 that were overstated by more than $46 million.[9]  (*Id.* at  ¶ 12.)  Also disclosed for the first time in the 10-K, was that SMIL had a net loss in 2008 of more than $35 million.  (*Id.*)

The 10-K announced that SearchMedia was "preparing indemnification claims against the former shareholders and directors of SMIL and Linden Ventures II (BVI), LTD ("Linden") for losses and damages it had incurred or will incur" because of accounting irregularities.  (Compl. ¶ 90.)

In March of 2011, Conway announced that in February 2011 SearchMedia had commenced claims against the former shareholders and directors of SMIL "for fraud and

---

[9] The originally reported revenue for 2007 was $7.8 million and for 2008 was $88 million.

breaches of representations, warranties and covenants contained in the Share Exchange

Agreement." (Compl. ¶ 91.)


**III.    Plaintiffs' Claims**

Plaintiffs allege that the Pre-Merger and Post-Merger Statements contained statements or

omissions that were materially false and/or misleading and that Defendants knew or were

severely reckless in disregarding their false and misleading nature. (Compl. ¶ 88.) According to

Plaintiffs, the Pre-Merger Statements overstated SMIL's 2007 and 2008 revenues, included

misleading projections for 2009, and failed to disclose that Ideation had not independently

verified SMIL's financial results during the due diligence period, which Plaintiffs allege were not

prepared in conformity with GAAP. (*Id.* at ¶¶ 65, 82.) Plaintiffs allege that in the Post-Merger

Statements, Defendants continued to hide SMIL's 2007 and 2008 actual revenues and to

overstate projections for 2009, and failed to fully disclose the apparent operational issues

confronting SearchMedia's in-elevator business. (*Id.* at ¶ 71.)

As to damages, Plaintiffs advance two theories, one for each of the subclasses of the

putative class. As to Plaintiffs and other members of the putative class who acquired

SearchMedia's securities between April 1, 2009 and August 20, 2010, Plaintiffs allege that they

did so at artificially inflated prices, caused by the Pre-Merger and Post-Merger Statements.

(Compl. ¶ 130.) After the information concealed from the market by the Defendants' Pre-Merger

and Post-Merger Statements  was disclosed, the price of SearchMedia's securities dramatically

declined and Plaintiffs suffered losses. (*Id.*)

As to Plaintiffs and other members of the putative class who were eligible to vote on the

Merger, Plaintiffs allege they were damaged as a result of their reliance on the Pre-Merger Statements in voting in favor of the Merger.  (Compl. ¶ 137.)  Had the true condition and value of SMIL been known, these shareholders would have voted against the Merger.  (*Id.*)  As a result, the Merger would not have been approved and, more likely than not, Ideation would have commenced liquidation and Ideation shareholders would have then received $7.8815 in cash per share of Ideation stock.  (*Id.*)

Based on the foregoing, Plaintiffs' four-count Complaint includes claims under Sections 10(b), 14(a) and 20(a) of the Exchange Act.  In Count I, Plaintiffs claim that all Defendants violated Section 10(b) by making materially misleading statements and omissions about SMIL's financial results and future prospects.  (Compl. ¶¶ 148-158.)  In Count II, Plaintiffs claim that the Individual Defendants are vicariously liable as "control persons," pursuant to Section 20(a), for SearchMedia and SMIL's violations of Section 10(b).  (*Id.* at ¶¶ 159-162.)  In Count III, Plaintiffs allege that all Defendants made actionable misstatements and omissions in the Proxy Statement Drafts and the 2009 Proxy Statement.  (*Id.* at ¶¶ 163-166.)  And, finally, in Count IV, Plaintiffs claim that the Individual Defendants are vicariously liable, pursuant to Section 20(a), for SearchMedia and SMIL's Section 14(a) violations.  (*Id.* at ¶¶ 167- 172.)

## Legal Standard

### I.    General Standard for Motions to Dismiss

In order to state a claim, Fed. R. Civ. P. 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  While a court, at this stage of the litigation, must consider the allegations contained in the plaintiff's complaint as true, this rule "is

inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). In addition, the complaint's allegations must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

In practice, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* (quoting Twombly, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* (citation omitted). The plausibility standard requires more than a sheer possibility that a defendant has acted unlawfully. *Id.* (citation omitted). Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Id.* (internal quotations and citation omitted). Determining whether a complaint states a plausible claim for relief is a context-specific undertaking that requires the court to draw on its judicial experience and common sense. *Id.* (citation omitted).

## II.    Expanded Evidence Considered

Normally, a court must limit its consideration on a motion to dismiss to the pleadings and written instruments attached as exhibits thereto; however, where a complaint alleges violations of securities laws, the court may consider certain other materials, such as documents incorporated by reference into the complaint and matters of which a court may take judicial notice. *See*

18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Courts may consider materials that are incorporated by reference into a complaint without converting a motion to dismiss to a motion for summary judgment if the document is (1) central to plaintiff's claim and (2) undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (holding district court did not err by considering a contract central to the dispute without converting the motion to a motion for summary judgment); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) (recognizing the incorporation by reference doctrine in a securities case). Additionally, the Eleventh Circuit has expressly held that a court may judicially notice relevant documents legally required by, and publicly filed with, the Securities and Exchange Commission ("SEC"). *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-81 (11th Cir. 1999). As the Eleventh Circuit stated, the "usual rules for considering 12(b)(6) motions are thus bent to permit consideration of an allegedly fraudulent statement in context." *Harris*, 182 F.3d at 802, n.2.

In this case, Defendants have attached Ideation's, SearchMedia's and certain of the Individual Defendants' SEC filings.[10] Thus, in deciding the instant Motion to Dismiss, the Court has considered the allegations of the Complaint as well as the contents of relevant SEC filings. *See Day*, 400 F.3d at 1276 ("The document need not be physically attached to a pleading to be incorporated by reference into it."). The Court notes that Plaintiffs did not object in their Response to the Court's consideration of the exhibits attached to Defendants' Motion.

---

[10] For example, Defendants attach the April 6, 2009 Ideation Form 8-K, the January 6, 2010 SearchMedia Form 8-K and Form 4's (Statements of Changes in Beneficial Ownership) filed by Frost, Uppaluri, Rubin and Fried that show their personal stock trades during the relevant period.

### III.    Standard for Pleading Securities Fraud

Plaintiffs allege violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, and also violations of Section 20(a) by the Individual Defendants as a result of the corporate Defendants' Section 10(b) violations.  For these claims, Plaintiffs must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 194-67, 109 Stat. 743, codified at 15 U.S.C. § 78u-4(b) ("PSLRA").  In order to state a claim for securities fraud under Rule 9(b), a plaintiff must allege:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Mizzaro v.  Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir.  2008) (quoting *Tello v.  Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir.  2007)).  The PSLRA imposes two additional requirements on plaintiffs pleading securities fraud.  First, a plaintiff must specify "each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading."  *Mizzaro*, 544 F.3d at 1238.  Second, the PSLRA raised the standard for pleading scienter; a plaintiff can no longer plead scienter generally.  *Id.*  The plaintiff must, for each alleged misrepresentation, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "Moreover, the complaint must allege facts supporting a strong inference of scienter for *each* defendant with respect to *each* violation."  *Mizzaro*, 544 F.3d at 1238 (emphasis added) (citing *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004)).

20

<u>Discussion</u>

**I.      Section 10(b)– Counts I and II**

In Count I Plaintiffs allege violations of Section 10(b) of the Securities Exchange Act and

Rule 10b-5 promulgated thereunder.  Section 10(b) states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce or of the mails, or of any facility of any
> national securities exchange-- (b) To use or employ, in connection with the
> purchase or sale of any security registered on a national securities exchange or any
> security not so registered, . . . any manipulative or deceptive device or contrivance
> in contravention of such rules and regulations as the [SEC] may prescribe as
> necessary or appropriate in the public interest or for the protection of investors.

 15 U.S.C. § 78j (2000).

Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce, or of the mails or of any facility of any
> national securities exchange, (a) To employ any device, scheme, or artifice to
> defraud, (b) To make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in the light of the
> circumstances under which they were made, not misleading, or (c) To engage in
> any act, practice, or course of business which operates or would operate as a fraud
> or deceit upon any person, in connection with the purchase or sale of any security.
> 17 C.F.R. § 240.10b-5 (2007).

In order to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege the

following: (1) the defendant made misstatements or omissions, (2) of a material fact, (3) with

scienter, (4) on which plaintiff relied, (5) that proximately caused plaintiff's injury.  *Bryant*, 187

F.3d at 1281; *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

In their Motion to Dismiss, Defendants argue that Plaintiffs' Section 10(b) claims, Counts

I and II, should be dismissed for two reasons: (1) Plaintiffs fail to satisfy the standard for

pleading scienter as to SearchMedia and the Ideation Defendants; and (2) Plaintiffs fail to

attribute the Pre-Merger and Post-Merger Statements to the Ideation Defendants.[11]  The Court finds it logical to address Defendants' second argument first.  If Plaintiffs have failed to attribute any false or misleading statements to Defendants, then there is no need consider whether Defendants acted with scienter.

### A.  Statements Attributable to the Ideation Defendants

Plaintiffs allege that all of the Ideation Defendants are liable for the Pre-Merger and Post-Merger statements made by Ideation or SearchMedia because these statements were "each group-published information, the result of the collective actions of the Individual Defendants." (Compl. ¶ 42.)  According to Plaintiffs, the Ideation Defendants are responsible for these statements because of their positions of authority within Ideation and SearchMedia and access to material non-public information.  (*Id.*)  Additionally, Plaintiffs allege that Defendants Fried and Frost were quoted in certain of the Pre-Merger Statements.[12]

In the Motion to Dismiss, Defendants argue that Plaintiffs have failed to attribute *all* of the Pre-Merger and Post-Merger Statements to *all* of the Ideation Defendants.  (D.E. 47 at 22.)

---

[11] Defendants do not challenge the sufficiency of Plaintiffs' allegations with respect to any other elements of their Section 10(b) claim.  Accordingly, the Court confines its analysis to addressing Defendants' arguments and does not reach whether Plaintiffs have sufficiently plead materiality, reliance, or proximate causation.

[12] Plaintiffs clearly attribute several of the Pre-Merger Statements to Defendant Fried personally.  (*See* Compl. ¶¶ 53, 54, 56, 64.)  These statements form the basis of Count I against Defendant Fried to the extent Plaintiffs have also alleged that they are false or misleading.  The only statement attributed directly to Defendant Frost, however, is his comment included in the April 2009 Statement that SMIL had "built a strong market position in China's fast-growing outdoor advertising market."  (Compl. ¶ 53.)  Plaintiffs do not allege that this statement in particular was false or misleading, and, so, the Court cannot find that Count I against Defendant Frost can be based on this statement.

Defendants concede that the Proxy Statement Drafts and the 2009 Proxy Statement can be attributed to all of the Ideation Defendants because they signed those documents (D.E.  47 at 23, n.3), but claim (1) that none of the other Pre-Merger Statements can be attributed to any of the outside directors of Ideation – Defendants Frost, Halpryn, Beier, Moskowitz and Gold (the "Ideation Outside Directors")[13]; and (2) that none of the Post-Merger Statements can be attributed to any of the Ideation Defendants.  (D.E. 47 at 23-25.)

### 1.    Pre-Merger Statements Attributable to the Ideation Outside Directors

Plaintiffs contend that all of the Pre-Merger Statements are properly attributed to all of the Ideation Defendants, including the Ideation Outside Directors, by virtue of the "group pleading doctrine."  (D.E. 49 at 19.)  Under that doctrine, a plaintiff may impute a company's public filings, press releases, or other "group published" information to those individuals involved in the day to day affairs of the company.  *See Phillips*, 374 F.3d at 1018.  The doctrine is premised on the assumption that "[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers."  *Id.*  (quoting *Wool v. Tandem Computers Inc.,* 818 F.2d 1433, 1440 (9th Cir.  1987).

The continued validity of the group pleading doctrine under the PSLRA varies among the circuits.  *See Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir.  2008) (rejecting group pleading doctrine); *Winer Family Trust v.  Queen*, 503 F.3d 319, 337 (3d Cir.  2007) ("group pleading

---

[13] Plaintiffs do not contest that the Pre-Merger Statements by Ideation can be attributed to Defendants Fried, Uppaluri and Rubin, as inside directors of Ideation.

doctrine is no longer viable”); *Southland Sec. Corp. v. Inspire Ins. Solutions*, 365 F.3d 353,

365 (5th Cir. 2004) (holding that under the PSLRA, “corporate officers may not be held

responsible for unattributed corporate statements solely on the basis of their titles, even if their

general level of day-to-day involvement in the corporation’s affairs is pleaded”); *Howard v.

Everex Sys., Inc.*, 228 F.3d 1057, 1061-63 (9th Cir. 2000) (continuing to apply group pleading

doctrine post PSLRA); *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir.

1997) (statements of company sufficiently attributed to board of directors by group pleading

doctrine). The Eleventh Circuit has acknowledged the debate among the circuits courts, but has

explicitly declined to rule on the issue.[14] *See Phillips*, 374 F.3d at 1019 (declining to address the

continued validity of the doctrine because plaintiff had included factual allegations “amply

linking each defendant to his alleged violation”). Courts in the Southern District of Florida have

permitted plaintiffs to attribute allegedly false statements to defendants via group pleading so

long as plaintiffs also “make the specific factual allegation that [defendant], due to his ‘high

ranking position and direct involvement in the everyday business of the Company,’ was ‘directly

involved in controlling the content of the statements at issue.’” *In re Pegasus Wireless Corp.

Sec. Litig.*, 657 F. Supp. 2d 1320, 1325 (S.D. Fla. 2009) (citing *Bruhl v. Conroy*, 2007 WL

983228, \*3 (S.D. Fla. March 27, 2007)); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1374 (S.D.

Fla. 2001).

       Defendants do not dispute that the group pleading doctrine continues to apply under the

---

[14]  The First, Sixth and Eighth Circuits have also expressly declined to reach the issue.
*See In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 961 n.6 (8th Cir. 2008);
*Miss. Pub. Emps.’ Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 93 n.10 (1st Cir. 2008);
*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.2d 650, 690 (6th Cir. 2005).

PSLRA, but argue that it is limited to *inside directors* of a corporation.  (*See* D.E.  47 at 17.)  The Court disagrees that the group pleading doctrine is strictly limited to inside directors, and instead agrees with other courts in this district that the doctrine survives the PSLRA as to individuals who are alleged to be directly involved in the everyday business of the company and in controlling the content of the statements at issue.  As to these individuals, it is reasonable to presume that information conveyed to the public in a company's SEC filings, press releases, and other public statements are the result of collective action.  But, a complaint must contain specific allegations as to each defendant's ability to control and role in controlling the content of the statements at issue.  In this case, Plaintiffs have failed to plead facts sufficient to apply the group pleading doctrine to the Ideation Outside Directors.

Plaintiffs do not provide any factual support for their vague and conclusory allegations that the Ideation Outside Directors, "because of their positions with the Company, possessed the power and authority to control the contents of SearchMedia's [public statements]."  (Compl.  ¶ 42.)  As to Defendants Halpryn, Beier, Moskowitz and Gold, Plaintiffs allege only that they served on the audit committee.  In their response, Plaintiffs contend this is sufficient.  (D.E. 49 at 19.)  But, there are no facts in the Complaint to suggest what Defendants Halpryn, Beier, Moskowitz and Gold actually did on the audit committee, that these Defendants were involved in the day-to-day business of Ideation, let alone how they controlled the content of the Pre-Merger Statements.  *See City of Monroe Emps. Ret. Sys.*, 399 F.2d at 690 (plaintiff failed to attribute company's allegedly false statements to defendant where it alleged "little more than his corporate titles, dates of employment and resignation, and attendance at the quarterly meetings); *Durgin v. Mon*, 659 F. Supp. 2d 1240, 1254 (S.D. Fla.  2009) (dismissing claims against individual

defendants where complaint included only "conclusory allegations regarding the role [d]efendants played in the Company" and was "missing . . . allegations showing that [d]efendants were insiders who were directly involved in controlling the content of the statements at issue").

Similarly, Plaintiffs' allegation that the Frost Group LLC ("Frost Group") made an $18.5 million investment in SearchMedia is insufficient to warrant application of the group pleading doctrine to Defendant Frost, as Plaintiffs contend.  (*See* D.E. 49 at 20.)  No where in the Complaint do Plaintiffs allege how Defendant Frost personally was involved in the Frost Group or why the investment by that entity placed Defendant Frost in a position to control the day-to-day business of Ideation, let alone control the content of the Pre-Merger Statements.

Thus, the Complaint does not include allegations from which the Court can infer that the Ideation Outside Directors had "significant involvement in the operations" of Ideation such that all of the Pre-Merger statements of Ideation can be attributed to them under the group pleading doctrine.  *HCM High Yield Opportunity Fund, LP v. Skandinaviska*, 2001 WL 26186526, *5 (S.D. Fla. Dec. 14, 2001) (finding complaint plead claim against outside director where it did "not merely group defendants together by virtue of their corporate officer and director status, but rather also allege[d] that [the outside director] . . . received and reviewed a draft of the offering memorandum prior to distribution and consented to its release).  Accordingly, the Ideation Outside Directors can only be held liable for misstatements and omissions in the Proxy Statement Drafts and 2009 Proxy Statement, which they are alleged to have signed.

### 2.   Post-Merger Statements Attributable to the Ideation Defendants

Defendants argue in their Motion to Dismiss that the Post-Merger Statements cannot be attributed to any of the Ideation Defendants.  (D.E. 47 at 25.)  Plaintiffs argue that the group

26

pleading doctrine does not apply to Defendants Uppaluri, Frost, Moskowitz, Beier and Gold post-Merger because they did not assume any leadership position within SearchMedia, and that the doctrine does not apply to Defendants Fried, Rubin and Halpryn because they continued on with SearchMedia only as outside directors.[15]  (*Id.*)  Plaintiffs concede that Defendants Uppaluri, Frost, Moskowitz, Beier and Gold are not liable for the Post-Merger Statements, but contend that the Post-Merger Statements are attributable to Defendants Fried, Rubin and Halpryn pursuant to the group pleading doctrine.  (D.E. 49 at 22, n.13.)

As discussed above, an outside director is not subject to group pleading doctrine absent certain factual allegations demonstrating a special relationship with the company.  Plaintiffs have not plead any facts to show that Defendants Fried, Rubin and Halpryn were involved in the day-to-day operations of SearchMedia such that, pursuant to the group pleading doctrine, they can be liable generally for Section 10(b) violations arising from the Post-Merger Statements.  Defendant Fried, however, may be held liable for alleged omissions in his comments in the April 2010 Statement regarding operational issues discovered at the Jingli subsidiary.  (*See* Compl. ¶ 76.)

The Complaint attributes at least one allegedly false and misleading statement to each of the Ideation Defendants — the Proxy Statement Drafts and 2009 Proxy Statement — and, so, survives Plaintiffs' challenge that Counts I and II are insufficient for failure to attribute any statements to the Ideation Defendants.  However, in any amended complaint, Plaintiffs must either remedy the deficiencies in their pleading against the Ideation Outside Directors with

---

[15] In their Response, Plaintiffs do not dispute Defendants' characterization of Defendants Fried, Rubin and Halpryn as outside directors of SearchMedia.

respect to the Pre-Merger Statements, except the Proxy Statement Drafts and 2009 Proxy Statement, or make clear that Counts I and II are not brought against the Ideation Outside Directors for the Pre-Merger Statements.  Likewise, Plaintiffs must either remedy the deficiencies in their pleading against the Ideation Defendants for the Post-Merger Statements or make clear that the Section 10(b) claims are not brought against the Ideation Defendants for those statements.

### B.  Particularized Allegations of Scienter

As stated above, a plaintiff must, for each alleged misrepresentation, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "Thus, beyond the who, what, when, where and how of the alleged fraud, a complaint pleading securities fraud must also plead the mens rea of the cause of action with specificity."  *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp.2d 1353, 1370 (S.D. Fla. 2001).

The Supreme Court has defined the level of scienter necessary to support a securities fraud claim as a "mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976).  In the Eleventh Circuit, proof that defendants acted with severe recklessness also satisfies the scienter requirement.  *Bryant*, 187 F.3d at 1282-84.  Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must

28

have been aware of it.  *Broad v. Rockwell Int'l Corp.*, 642 F.3d 929, 961-62 (5th Cir. 1981).[16]

The Supreme Court clarified what is meant by a "strong inference" of scienter under the PSLRA in *Tellabs, Inc. v. Makor Issues & Rights, Ltd*.  There it held that a "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  551 U.S. at 324.  It is an inherently comparative inquiry because a court not only looks at whether the pled facts give rise to a strong inference of scienter, but also takes into account any opposing inferences.  *Id.* at 323-24.  "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter as least as strong as any opposing inference?"[17]  *Id.* at 2511.  Thus, the Court does not scrutinize each of Plaintiff's allegations in isolation, but rather assesses all of the allegations holistically.  *Id.*

Since the PSLRA requires Plaintiffs to "allege facts supporting a strong inference of scienter for *each* defendant with respect to *each* violation," *Mizzaro*, 544 F.3d at 1238 (emphasis added) (citation and quotation omitted), the Court will look at the allegations specifically pled as to each Defendant and determine whether there is a strong inference of scienter.

### 1.  Allegations Regarding the Scienter of the Ideation Defendants

Plaintiffs do not allege that Defendants actually knew that the financial condition of

---

[16] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

[17] The Eleventh Circuit in *Mizzaro* pointed out that the "strong inference" standard under *Tellabs* is different from the summary judgment standard because it asks what a reasonable person *would* think, not what a reasonable person *could* think.  *Mizzaro*, 544 F.3d at 1239 (*comparing Tellabs*, 551 U.S. at 323-24 *with Anderson v. Liberty Lobby, Inc.*, 477 U.S. 252 (1986)).

SMIL was overstated in the Pre-Merger and Post-Merger Statements.  Rather, Plaintiffs allege a series of circumstantial factors they claim lead to a strong inference of scienter based on severe recklessness.  Essentially, Plaintiffs argue: (1) the Ideation Defendants were severely reckless because of their experience, sophistication, and due diligence (Compl. ¶¶ 95-104); (2) the Ideation Defendants were severely reckless because of the sheer magnitude of the accounting adjustments and flagrant red-flags and accounting irregularities apparent in SMIL's books and records (*id.* at ¶¶ 106-107); and (3) a strong inference of scienter can be drawn from the financial motivation of the Ideation Defendants to consummate the Merger (*id.* at ¶¶ 118-124).

As a preliminary matter, Plaintiffs' reliance on group pleading to set forth nearly all of the scienter allegations makes it impossible for the Court to determine if any of the Ideation Defendants acted with scienter based upon these allegations.  (*See* Compl.  ¶¶ 95-124.)  The Court finds that, while the group pleading doctrine survives the PSLRA as to Rule 9(b)'s particularity requirements so long as certain other facts as to the defendant's involvement in the company are plead, the doctrine does not apply to the PSLRA's scienter requirements.  *See*

 *See Phillips*, 374 F.3d at 1018 (holding that "a plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations"); *Durgin*, 659 F. Supp. 2d at 1253 (holding that the group pleading doctrine survives the PSLRA as to Rule 9(b)'s particularity requirements, but does not apply to the PSLRA's scienter requirements); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1322 (S.D. Fla. 2004) (same); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1341 (S.D. Fla. 1999) (same). Accordingly, Plaintiffs group pleading of its scienter allegations are improper.

After taking away the vague, group pleading allegations, the Complaint contains only a

few substantive allegations that specifically reference individual Ideation Defendants and, therefore, may support a finding of scienter as to these Defendants.  These allegations are as follows:

(1)   **Defendants Fried, Uppaluri and Rubin** – Each of these Defendants served on the Board of Directors of Ideation and was "actively involved" in the negotiations and due diligence leading up to the Merger.  (Compl.  ¶¶ 27, 29, 30.)  Specifically, Defendants Fried, Uppaluri and Rubin met with SMIL management in Miami and also traveled to SMIL headquarters in China to "review diligence items and tour the facilities."  (*id.* at ¶¶ 27, 29, 30, 100.)  Defendants Uppaluri and Rubin also participated in an initial investment in Ideation of $2,425,000, along with Defendants Halpryn, Beier, Moskowitz and Gold.[18]  Plaintiffs do not allege that Defendant Fried invested any money in Ideation.  Plaintiffs allege that Defendant Uppaluri "has years of professional experience in finance related positions" and that he and Defendant Rubin and Frost had been responsible for the "due diligence, structuring, negotiating and closing of numerous transactions."  (*id.* at ¶ 96.)

(2)   **Defendant Frost** – Defendant Frost was Chairman of the Board of Ideation pre-Merger and has extensive experience in "numerous transactions." (Compl. ¶ 28.)  In addition to participating in the initial $2,425,000 investment, Plaintiffs allege that The Frost Group, LLC invested $18.5 million in Ideation pre-Merger

---

[18] As set forth above, Defendants purchased $25,000 in stock in the Ideation IPO, and an additional $2,400,000 of warrants in a private placement transaction that occurred simultaneously with the IPO.  (Compl. ¶ 4.)

(*id.* ¶ 53.)

(3)     **Defendants Halpryn, Beier, Moskowitz and Gold** – Defendants Halpryn, Beier,
Moskowitz and Gold (the Ideation Outside Directors), were directors of Ideation
and members of its audit committee.  (Compl. ¶¶ 31-34.)  Beyond this, and that
these Defendants participated in the $2,425,000 initial investment in Ideation,
there are no allegations in the Complaint specific to these Defendants.

Even "taken collectively," the individualized allegations against the Ideation Defendant
do not give rise to a strong inference of scienter as to any of the Ideation Defendants.  *Tellabs*,
551 U.S. at 326; *see Phillips*, 374 F.3d at 1017 (interpreting the PSLRA as permitting the
"aggregation of facts to infer scienter" and considering whether the allegations as to each
defendant, taken together, satisfied the scienter requirement).  The Court discusses each of
Plaintiffs' arguments as to scienter below.

### 2.   Plaintiffs' Argument that the Ideation Defendants' Experience Gives Rise to an Inference of Scienter

Plaintiffs allege that because the Ideation Defendants "held themselves out as experts in
acquiring company's (sic) and conducting due diligence," they were severely reckless.  (D.E. 45
at 55-56.)  The crux of this argument seems to be that the Ideation Defendants recklessly
represented in the Proxy Statement Drafts and 2009 Proxy Statement that "the acquisition of
SMIL satisfied the 'requirement that any business acquired by Ideation have a fair market value
equal to at least 80% of Ideation's net assets at the time of acquisition,'" based upon their
"experience in performing due diligence of acquisition targets and in valuing companies."
(Compl. ¶¶ 96, 98.)

It is not clear to the Court how Defendants' representations as to their experience demonstrate severe recklessness.  Plaintiffs cite no authority for the proposition that such representations can serve as the basis for a strong inference of scienter.  Nor do Plaintiffs' allegations suggest that the Ideation Defendants should have known of SMIL's true financial condition because of their experience with other mergers.  Plaintiffs make no particularized allegations at all regarding the experience of Defendants Fried, Halpryn, Beier, Moskowitz and Gold and as to the experience of Defendants Uppaluri, Rubin and Frost, Plaintiffs only make allegations regarding their experience generally.  Plaintiffs do not allege that these Defendants had any experience with Chinese companies or advertising companies specifically, and do not allege why their general business experience should give rise to a strong inference of scienter.

### 3. Plaintiffs' Argument that the Ideation Defendants' Due Diligence Gives Rise to an Inference of Scienter

Plaintiffs next allege that the Ideation Defendants' due diligence gives rise to a strong inference of scienter.  (Compl. ¶ 99.)  Plaintiffs argument is apparently two-fold: (1) Plaintiffs were severely reckless in conducting due diligence (*id.* at ¶¶ 99-103) and (2) Plaintiffs were severely reckless in representing that they had conducted "extensive" due diligence. (*id.* at ¶¶ 104-105.)  For the reasons below, Plaintiffs fail to support the first theory with individualized allegations sufficient to support a compelling inference of scienter against any of the Ideation Defendants.  Plaintiffs' second theory – that Defendants were reckless in representing they had conducted due diligence –  may amount to a false or misleading statement, but does not in itself demonstrate that Defendants were reckless in making the Pre-Merger Statements.

As a general matter, defendants' failure to discover irregularities in due diligence does not, by itself, reflect an extreme departure from the standards of ordinary care.  *See Druskin*, 299

33

F. Supp. 2d at 1328 (denying plaintiff's allegation that defendants should have reserved more

violated GAAP and established the requisite scienter).  Moreover, the Complaint only includes

particularized allegations of due diligence with respect to Defendants Fried, Uppaluri and Rubin.

There is no mention of any due diligence by the other Ideation Defendants.  And, as to

Defendants Fried, Uppaluri and Rubin, Plaintiffs only allege that they were "actively involved"

and that they attended meetings in Miami and China, but say nothing about what these

Defendants learned as a result of this diligence.  Without allegations of "what defendants knew,

how they knew it, and when they knew it," Plaintiffs' allegations that Defendants Fried, Uppaluri

and Rubin must have known about SMIL's financial condition as a result of their due diligence

are insufficient to make out the element of scienter under the heightened PSLRA and Rule 9(b)

standards.  *Feeney v. Mego Mortg. Corp.*, 45 F. Supp. 2d 1356, 1357 (N.D. Ga. 1999) (pleading

that defendants "must have known" the falsity of their statements was insufficient under the

heightened pleading standards).

### 4.  Plaintiffs' Argument that the Magnitude of Adjustments Gives Rise to an Inference of Scienter

Plaintiffs also allege that the sheer magnitude of adjustments to SMIL's financial

statements and other flagrant red-flags and accounting irregularities apparent in SMIL's books

and records, gives rise to a strong inference that the Ideation directors acted with scienter (*id.* ¶¶

106-107).  Defendants are correct that allegations of drastic overstatements and flagrant

accounting violations are all probative of a strong inference of scienter as to a director or officer

of a company.  *See In re Eagle Building Tech., Inc. Sec. Litig.*, 319 F. Supp. 2d 1318, 1328 (S.D.

Fla. 2008).   However, in this case, the Ideation Defendants were directors of the acquiring

company, not the target company whose financial results were overstated.  Plaintiffs claim,

without any support, that the Ideation Defendants' "status as directors of the acquirer business and SMIL's status as the target business does not alter the analysis." (D.E. 49 at 10.)  The Court disagrees.  Indeed, each of the cases Plaintiffs cites concerns an inference of scienter being drawn against an officer of the company with the alleged irregularities.  Upon this authority, the fact that SMIL's financial statements included irregularities may compel an inference that the SMIL Defendants acted with scienter, but does not compel an inference that the Ideation Defendants did.

### 5. Plaintiffs' Argument that the Ideation Defendants' Financial Motivation Gives Rise to an Inference of Scienter

Finally, Plaintiffs allege that the Ideation Defendants' investment in Ideation motivated them to "ensure that stockholders approved the Merger by withholding any information about SMIL's accounting and internal control issues uncovered in their due diligence." (*Id.* at ¶ 118.) The alleged basis of Defendants' financial motivation is Defendants Uppaluri, Rubin, Frost, Halpryn, Beier, Moskowitz and Gold's single, collective investment in Ideation of $2,425,000.

Although Defendants clearly purchased Ideation stock for a fraction of the price paid by investors in the IPO and stood to gain millions if the Merger enjoyed long-term success, Plaintiffs do not allege that any Defendant profited from their investment.  SearchMedia disclosed SMIL's accounting improprieties before the Ideation Defendants were entitled to sell their warrants. (D.E. 47, Ex. A at 12.)  And, none of the Ideation Defendants sold Ideation stock at artificially inflated prices after the Merger. (*See* D.E. 47, Exs. K-O.)  Additionally, post-Merger, SearchMedia and the Frost Group acquired additional stock at inflated prices.[19]

_____

[19]  In December 2009, SearchMedia authorized a stock and warrant repurchase program through which the company repurchased $3.8 million in warrants in January 2010. (D.E. 47 at

While it is not necessary that defendants profit from their fraud to demonstrate scienter, the allegations in the Complaint and information in the SEC filings, taken together, do not support a strong inference of the Ideation Defendants' scienter based on financial motivation. *See Mizzaro*, 544 F.3d at 1253; *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1326 (M.D. Fla. 2002) (finding that lack of sales by high-level insiders weighed against an inference of scienter); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1377 (S.D. Fla. 2001) (finding defendants' alleged "desire to consummate several mergers and acquisitions between 1997 and 1999" were entitled to "limited weight"). Rather, the allegations in the Complaint concerning the Ideation Defendants' investment in Ideation, taken together, give rise to an inference that the Defendants did not know of SMIL's true financial condition until *after* the Merger. This inference is at least as compelling as the opposing inference that these Defendants acted with scienter in making the Pre-Merger Statements. *See Tellabs, Inc.*, 551 U.S. at 324.

### 6. Allegations Regarding SearchMedia's Scienter

Defendants also argue that Plaintiffs have not alleged that SearchMedia acted with scienter in the Pre-Merger and Post-Merger Statements. The Court agrees. As set forth above, Plaintiffs improperly rely upon the group pleading doctrine to plead scienter and their few particularized allegations do not demonstrate the scienter of any of the Ideation Defendants. Absent allegations establishing scienter as to any individual defendants, a plaintiff can plead corporate scienter only where its allegations show "that somebody responsible for the allegedly misleading statements must have known about the fraud." *Mizzaro*, 544 F.2d at 1254-55

---

Ex. J at 16.) The Form 4 filings show that the Frost Group bought an additional 50,000 shares of SearchMedia common stock in the open market in January 2010, at the inflated prices. (*See id.* at Exs. E, G, K.)

(dismissing claim Section 10(b) claim against corporation where the complaint did not create any inference that any defendants or unnamed parties were both responsible for false statements and were aware of the alleged fraud).  Plaintiffs assert that scienter may be imputed to SearchMedia for the Post-Merger Statements because the cumulative knowledge of the Defendants suffices to support a finding of corporate scienter.  (*See* D.E. 49 at 18, n.11.)  But, Plaintiffs cite no authority from this circuit recognizing a "cumulative knowledge" theory of scienter.  (*Id.*)

The Court also finds Plaintiffs fail to allege that SearchMedia acted with scienter as to the Post-Merger Statements.  The scienter of the SearchMedia Defendants is imputed to SearchMedia.  The SearchMedia Defendants include some of those SMIL Defendants who managed SMIL and may be responsible for its GAAP violations and accounting irregularities. (Compl. ¶¶ 36-41.)  However, as with the Ideation Defendants, the Complaint relies on the group pleading doctrine to set forth all of the allegations relating to the SMIL Defendants' scienter. (*See id.* at ¶¶ 90-94.)  Accordingly, the Court must conclude that Plaintiffs have failed to plead the scienter of SearchMedia with respect to the Post-Merger Statements.


## II.     Section 14(a)– Counts III and IV

Counts III and IV are based on Defendants' alleged violations of Section 14(a) of the Exchange Act.  To state a claim under Section 14(a) of the Exchange Act and Rule 14a–9, a plaintiff must allege that the defendant prepared a proxy statement containing a material misstatement or omission that caused the plaintiff's injury.  *See Shaev v. Saper*, 320 F.3d 373, 379 (3d Cir. 2003).  The Complaint must allege that "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the

transaction." *See id.* (internal quotation marks omitted).  Although not requiring scienter, a Section 14(a) claim requires an allegation that the defendant negligently drafted the proxy statement.  *See Wilson v. Great Am. Inds.*, 855 F.2d 987, 995 (2d Cir. 1988).

In their Motion to Dismiss, Defendants argue that Plaintiffs' Section 14(a) claims, Counts III and IV, should be dismissed for two reasons: (1) Plaintiffs fail to plead sufficiently that the statements underlying these claims were subjectively false; and (2) Plaintiffs fail to plead sufficiently that the Ideation Defendants were negligent in making the underlying statements. The Court rejects both Defendants' arguments and will deny the Motion to Dismiss as to Counts III and IV.

Defendants' first argument is that Plaintiffs have not stated a claim against the Ideation Defendants with respect to the "opinions" included in the Proxy Statement Drafts and 2009 Proxy Statement because Plaintiffs fail to plead that these statements were both objectively and subjectively false.  (D.E. 47 at 27-28.)  But, Plaintiffs allege that the Proxy Statement Drafts and 2009 Proxy Statement include false statements and omissions of material fact, not merely opinion.  (*See* Compl. ¶ 62, 65).  Namely, Plaintiffs clearly allege that the historical financial results of SMIL included in the Proxy Statement Drafts and 2009 Proxy Statement were false and drastically overstated.  (*See id.*)  As to these statements, it is sufficient for Plaintiffs to plead, as they have, that these statements were objectively false.  Courts in this circuit have not required plaintiffs to plead subjective falsity-- that defendants made such statements with actual knowledge of their falsity.  *See Edward J. Goodman Life Income Trust v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1290 (M.D. Fla. 2009), aff, 595 F. Supp. 2d. 783, 797 (11th Cir. 2010); *Harvey M. Jasper Ret. Trust v. Ivax Corp.*, 920 F. Supp. 1260, 1266 (S.D. Fla. 1995) ("Plaintiffs need

38

not plead or prove privity, reliance, causation or scienter in order to recover under [Section 14(a)]").

The Court cannot address Plaintiffs argument that certain of the other statements in the Proxy Statement Drafts and 2009 Proxy Statement are "opinions", *ie* that SMIL "business model is highly scalabale" and that SMIL "has demonstrated an attractive financial profile," because it is not clear to the Court that Plaintiffs' Section 14(a) claims are in fact based on these portions of the statements.  In any amended pleading, Plaintiffs must make clear which portions of the Proxy Statement Drafts and 2009 Proxy Statement they contend are false or misleading, and set forth specifically any omissions.  *See Mizzaro*, 544 F.3d at 1238 (finding that the PSLRA requires a plaintiff to specify "each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading").

Defendants second argument is that Plaintiffs have not adequately plead negligence with respect to the Ideation Defendants.  But, Plaintiffs have set forth sufficient allegations to support negligence.  They have alleged that the Ideation Defendants failed to conduct sufficient due diligence leading up to the Merger (Compl. ¶¶ 101-103); and failed to appreciate red-flags in SMIL's internal controls (*id.* at ¶¶ 114-116), among other things.  At this stage, Plaintiffs' allegations are sufficient to state a claim against the Ideation Defendants and SearchMedia for violations of Section 14(a), and against the Ideation Defendants for vicarious liability under Section 20(a).

### III.     Section 20(a)– Counts II and IV

Defendants' final argument in their Motion to Dismiss is that Plaintiffs' Counts II and IV,

against the Ideation Defendants for vicarious liability pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), should be dismissed because Plaintiffs fail to adequately plead underlying violations of the Exchange Act against SearchMedia.  (D.E. 47 at 34).  Defendants concede that the Complaint asserts that the Ideation Defendants acted as "controlling persons" of SearchMedia.  (*Id.*)

As set forth in Sections I and II *supra*, Plaintiffs have not sufficiently alleged Section 10(b) violations, but have alleged violations of Section 14(a).  Accordingly, Count II will be dismissed.  *See Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996);  *Malin v. Ivax Corp.*, 17 F. Supp. 2d 1345, 1351 (S.D. Fla. 1998) ("Of course, without a primary violation of the securities laws, there can be no secondary violation under § 20(a)") (citing *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1132 (2d Cir. 1994)).

### Conclusion

It is hereby

ORDERED AND ADJUDGED that Counts I and II of the Amended Complaint (D.E. 45) are DISMISSED WITHOUT PREJUDICE.  It is further

ORDERED AND ADJUDGED that Plaintiffs shall have twenty (20) days from the date of this Order in which to serve an amended complaint that is in compliance with the PSLRA's pleading requirements and otherwise consistent with this Order.  Failure to file an amended complaint by this date will result in dismissal of the Complaint with prejudice.  It is further

DONE AND ORDERED in Chambers, in Miami, Florida this 8th day of August, 2011.

_Ursula Ungaro_

URSULA UNGARO
UNITED STATES DISTRICT JUDGE

cc: Counsel of Record